Joseph L. **TRUEBLOOD**, Appellant (Petitioner below),

v.

**STATE of Indiana**, Appellee (Respondent below).

No. 79S00–9211–PD–887.

Supreme Court of Indiana.

Sept. 9, 1999.

Susan K. Carpenter, Public Defender of Indiana, John S. Sommer, Kathleen Cleary, Chris Hitz–Bradley, Deputy Public Defenders, Indianapolis, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Joseph L. Trueblood pleaded guilty to the murders of Susan Bowsher and her two children. He was sentenced to death for each of the three murders. He appeals the denial of his petition for postconviction relief and raises eight issues, which we restate as four: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) the postconviction court's summary disposition of claims and exclusion of evidence at the postconviction hearing; and (4) the voluntariness and intelligence of the guilty pleas.

**Factual and Procedural Background**

On August 15, 1988, Trueblood picked up his ex-girlfriend Susan Bowsher and her two children and, while they were in his automobile, shot each of them in the head. After borrowing a shovel from his brother's home, Trueblood took the bodies to a secluded area and buried them in a shallow grave. *Trueblood v. State,* 587 N.E.2d 105, 107 (Ind. 1992).

Trueblood pleaded guilty to the murder of Susan on October 6, 1988. More than a year later he sought to withdraw that guilty plea, but his request was denied. In February of 1990, a jury trial commenced for the murders of the two children. After two days of trial, Trueblood pleaded guilty to both murders and the trial court accepted those guilty pleas. A few days later, Trueblood sought leave to withdraw the last two guilty pleas

and that leave was also denied by the trial court. Trueblood was sentenced to death on each of the three counts. On direct appeal this Court affirmed the trial court's denials of the motions to withdraw his guilty pleas. The death sentences were also affirmed. *See id.* at 110–11.

Trueblood then filed a petition for postconviction relief. Both parties moved for summary judgment as to some issues, and the trial court denied Trueblood's motion, granted the State's, and sua sponte dismissed some of Trueblood's other claims. After an evidentiary hearing that spanned five days, the postconviction court denied Trueblood's remaining claims. This appeal ensued.

### Standard and Extent of Review

■ Trueblood bore the burden of establishing the grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5). Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues Trueblood must convince this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Harrison v. State,* 707 N.E.2d 767, 773 (Ind.1999) (citing *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995)). We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the postconviction court. *Id.* at 774.

■ Postconviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. *Rouster v. State,* 705 N.E.2d 999, 1003 (Ind.1999). Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the postconviction rules. *Id.;* P–C.R. 1(1). If an issue was known and available but not raised on direct appeal, it is waived. *Rouster,* 705 N.E.2d at 1003. If it was raised on

appeal but decided adversely, it is res judicata. *Id.* (citing *Lowery v. State,* 640 N.E.2d 1031, 1037 (Ind.1994)).[1] If not raised on direct appeal, a claim of ineffective assistance of trial counsel is properly presented in a postconviction proceeding. *Woods v. State,* 701 N.E.2d 1208 (Ind.1998). A claim of ineffective assistance of appellate counsel is also an appropriate issue for postconviction. As a general rule, however, most free-standing claims of error are not available as such in a postconviction proceeding because of the doctrines of waiver and res judicata. Some of the same contentions, to varying degrees, may be properly presented in support of a claim of ineffective assistance of trial or appellate counsel. However, postconviction counsel run the risk of waiving available claims of ineffectiveness by presenting them as free-standing claims.[2] We address the issues Trueblood raises in this appeal primarily as claims of ineffective assistance of counsel, but also address those free-standing claims that are not barred by res judicata or waiver.

### I. Ineffective Assistance of Trial Counsel

■ Trueblood's primary claim in this appeal is ineffective assistance of trial counsel in both his guilty pleas and his sentencing hearing. To establish a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must show that (1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confi-

---

1. Trueblood responds to the State's waiver argument by asserting that his claims "fall within the 'additional argument' exception to the doctrine of *res judicata, Lowery v. State,* 640 N.E.2d 1031 (Ind.1994), 'because it is not a duplicate of any issue he raised on direct appeal, *Baird v. State,* [688 N.E.2d 911 (Ind.1997).]'" Neither case cited permits a petitioner to raise issues known and available at the time of the direct appeal in a petition for postconviction relief.

2. The possibility of waiver also exists when a claim is improperly raised as a free-standing claim but then mentioned in passing as part of an ineffective assistance of counsel argument with a cross-reference to the full argument in another section of the brief. *See* 4A KENNETH M. STROUD, INDIANA PRACTICE § 7.2 at 96 (2d ed.1990) ("[i]t is not sufficient to merely refer to a prior argument in the brief") (citing *Williams v. State,* 408 N.E.2d 123 (Ind.Ct.App.1980)).

dence in the outcome." *Id.* at 694, 104 S.Ct. 2052. More recently, the Supreme Court of the United States held that prejudice resulting from ineffective assistance is not established unless the error rendered the result of the proceeding fundamentally unfair or unreliable. *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

### A. *Guilty Pleas*

Six weeks after being charged with the three murders, Trueblood pleaded guilty without a plea agreement to Susan's murder (Count III). His counsel at that time was Tippecanoe County Public Defender George Wilder. Wilder's appearance was withdrawn almost a year later when he left the public defender's office. Wilder was replaced by Thomas O'Brien and Michael O'Reilly, and a motion to withdraw the guilty plea was filed a few months later. The trial court denied the motion, and two months later a jury trial began for the murders of the children (Counts I and II). After jury selection had been completed and several witnesses had testified, Trueblood pleaded guilty, again without a plea agreement, to the murders of the children.

A few days later Trueblood denied the factual bases of these pleas in a presentence investigation interview with a probation officer. Defense counsel moved for a competency evaluation, and Trueblood was evaluated by a court-appointed psychologist and a psychiatrist, both of whom concluded that he was competent to stand trial, make judgments about a guilty plea, and assist in his defense. Trueblood then moved to withdraw the second guilty plea. Both of his counsel also filed a notice of perjured testimony and sought to withdraw their appearances on the basis that Trueblood had used them "as part of a scheme to submit to the Court perjured testimony," which broke down the attorney-client relationship. The trial court denied the motion to withdraw the guilty plea and the motion to withdraw as counsel.

■■■ Trueblood argues that he was denied effective assistance of counsel in each of his three guilty pleas. Trueblood contends that "[c]ounsel should not have allowed Trueblood to plead guilty to [Susan's murder] prior to an adequate mental health evaluation, including neuropsychological testing." He makes no further suggestion what "an adequate mental health evaluation" would have entailed or how its results would have altered the decision to plead guilty. Defense counsel hired a licensed psychiatrist to examine Trueblood within days of his arrest. The psychiatrist's report concluded that "Trueblood was fully sane at the time of my interview with him and I have the evidence to suggest that he was also sane at the time of the offense. He is competent to stand trial . . . ." In the face of this report, counsel's advice to plead guilty cannot be regarded as below acceptable performance.[3]

■■■ Trueblood also argues that he had other "potential defenses" to Susan's murder, specifically that (1) he fired a mercy shot at Susan only after she attempted to kill herself and (2) that he was upset from a lover's split and was acting under sudden heat when he killed her. These "potential defenses" are problematic at best. It is unlikely that a jury would have bought the mercy killing story, especially in light of Trueblood's brother's trial testimony that Trueblood confessed to the killings and asked for a shovel with which to bury the bodies. Moreover, pursuing a voluntary manslaughter defense would almost certainly have required Trueblood to testify. Although the State has the burden of disproving sudden heat beyond a reasonable doubt, in order to inject that issue at all, the defendant must point to some evidence supporting sudden heat. *See Wolfe v. State,* 426 N.E.2d 647, 652 (Ind.1981). Because Trueblood was the only surviving occupant of

---

3. Trueblood points out that Dr. Davis' report was dated October 7, 1988, the day after the guilty plea hearing. He concludes that "[n]o evidence suggests that counsel was privy to Davis' results prior to the date of the report." Although Trueblood submitted affidavits from both Wilder and Dr. Davis, neither affidavit addresses this point. Trueblood bore the burden of establishing his grounds for relief in the postconviction court. Ind. Post–Conviction Rule 1(5). Trueblood failed to meet his burden on this issue. Moreover, the more reasonable conclusion is that Wilder learned of at least Dr. Davis' general conclusions sometime during the six week period between his examination of Trueblood and the guilty plea hearing.

the car at the time of the killings, evidence of sudden heat could have come only from him. The risk of a devastating cross-examination was obvious, and the judgment not to expose Trueblood to this cannot be the basis of ineffective assistance of counsel.

■ Wilder did not testify at the postconviction hearing, but both Trueblood and the State submitted affidavits from him. The affidavit submitted by Trueblood indicated that the decision to plead guilty was designed to (1) demonstrate Trueblood's cooperativeness and (2) possibly "anchor the case before Judge Thayer," whom Wilder believed to be "the least likely Judge to sentence Mr. Trueblood to death." [4] The affidavit submitted by the State noted that

> [e]arly on and after a considerable amount of time advising Mr. Trueblood, a strategic decision was made to cooperate as much as prudently possible in the hope of convincing the State of Indiana to dismiss the death penalty or persuading the fact finder—the jury or the judge—not to impose the death penalty. In this regard, and upon the substantial completion of important aspects of the defense investigation, Mr. Trueblood decided to plead guilty to Susan's death because, among other reasons, such a plea was consistent with his account of the events and the plea might enhance the credibility of his case later at a trial as to the children or during the penalty phase of the case by showing he sincerely accepted responsibility for what he had done.

The decision to plead guilty was ultimately Trueblood's. However, that decision required at least some reliance on the advice of Wilder. The postconviction court found that the decision to plead guilty to Count III was a matter of strategy and an informed tactical decision made by Trueblood and his counsel.

We agree that Wilder's advice to cooperate and plead guilty was a reasonable judgment under the circumstances.

■ Trueblood also argues ineffective assistance relating to the guilty pleas to Counts I and II. These pleas occurred after the State had presented several witnesses at trial. The decision to plead guilty was reached after a lengthy discussion on the evening of the second day of trial testimony. O'Reilly testified in his postconviction deposition that the day before the guilty plea "was the roughest day I personally had ever had in court . . . . [and] we knew it wasn't going to get any better. . . . I was looking at that jury and their faces were sober and very, very serious." According to O'Reilly, the decision to plead guilty was left up to Trueblood, after counsel gave him an idea of how the trial was likely to proceed. Counsel knew what evidence the State had yet to present and viewed it as "devastating." Moreover, had the trial continued, Trueblood's "defense was minimal at best." O'Brien stated in his postconviction deposition that the fact that the victims were children also factored into counsel's thinking: "We felt the nature of the case, being children, that the jury would recommend [the death penalty] on a conviction and the judge would certainly follow the jury's recommendation. I thought that his one opportunity may be to avoid the [death] penalty would be to throw himself on the mercy of [Judge] Melichar." The guilty pleas allowed trial counsel to devote their time and energy to mitigation rather than spending several more days defending a guilt phase that appeared hopeless. Trueblood told the psychiatrist who evaluated his competency one week after this guilty plea that he shared his attorneys' bleak view of the trial. According to the psychiatrist, Trueblood "stated that the evi-

---

4. According to the affidavit, at the time of Trueblood's guilty plea "the prosecution was able to move cases around between courts and the defense could do little about it." Several months after the guilty plea was accepted, the case was transferred from Tippecanoe Superior Court, where Judge Thayer presided, to Tippecanoe Circuit Court, where Judge Melichar presided. The State's "Motion to Transfer" requested transfer "to Circuit Court with agreement by Judge Melichar of Circuit Court." The affidavit that Judge Melichar submitted to the postconviction court stated that "someone," possibly Judge Thayer or a member of his staff, asked if he would be willing to accept Trueblood's case. Judge Melichar agreed "to accept this case, as I had accepted others from [Judge Thayer], because his health was a problem and the management of his caseload was a matter of concern to him and was burdensome." Trueblood does not challenge the propriety of the transfer in this appeal.

dence presented in court made a strong impact upon him and when he appraised the impact the evidence made on the jury and his impression of what his attorneys felt he states that he decided he would not be acquitted and thus pleaded guilty."

Trueblood contends that counsel were ineffective for "pressuring" him to plead guilty after he had to witness "enormously gruesome" autopsy pictures and hear his twin brother testify against him. Trueblood also argues that trial counsel sought to rush a plea and points to the affidavit of Judge Melichar, which states that one of Trueblood's trial attorneys called him at home "sometime after 9:00 p.m." to ask him to convene court that evening for a guilty plea hearing. Judge Melichar declined and told the attorney to sleep on it. In the same vein, Trueblood cites his counsel's failure to have him reexamined or assessed by the defense's neuropsychological expert regarding the voluntariness of the plea. These rather conclusory allegations all relate to judgments that are required to be made under the pressures of a trial and as to which there is no correct choice. The postconviction court found that the guilty pleas occurred after "very strong, highly persuasive evidence" was submitted to the jury. It found no deficient performance because Trueblood had conferred with counsel and family members and

> decided to try to cut his losses, short circuit the influence of the evidence on the jury and through the jury to the Judge, and enter a plea of guilty continuing the effort to appear cooperative and compliant and remorseful and attempting to avoid the imposition of the death penalty.

The postconviction court's finding is fully supported by the record.

### B. Penalty/Sentencing Hearing

■ Trueblood also contends that he was denied the effective assistance of counsel by the alleged failure of trial counsel to investigate and present more mitigating evidence. Trueblood's primary argument in this appeal is that trial counsel were ineffective for failing to present evidence relating to his neurocognitive deficits.[5] However, Trueblood's trial counsel employed several experts who examined various aspects of his mental health. These included Dr. Larry Davis, a licensed psychiatrist;[6] Dr. Diane Follingstad, a clinical psychologist;[7] Dr. Thomas Curfman, a neurologist;[8] Drs. Richard Loughead and Kathryn Black, both psychologists;[9] and Dr. Raymond Horn, a clinical

5. When asked about the specific nature of Trueblood's "brain damage" at oral argument, Trueblood's counsel used the term "organic brain syndrome." However, this term does not appear in the briefs.

6. Within days of the offense, Dr. Larry Davis "conducted an early assessment regarding Mr. Trueblood's competency and a gross evaluation of Mr. Trueblood's sanity at the time of the offense." Dr. Davis concluded that Trueblood was competent to stand trial and "fully sane" at the time of the interview. He also wrote that he had "evidence to suggest that [Trueblood] was also sane at the time of the offense." Dr. Davis observed that Trueblood's "[t]hought processes as well as thought content were appropriate to the interview."

7. Dr. Follingstad evaluated Trueblood as to his adaptability to prison and potential for rehabilitation in the event that he was ever released from prison. She had Trueblood complete a MMPI, MCMI, and TAT, and she interpreted the only abnormal results as social introversion, avoidant personality style, and a feeling that "things" over which he has no control are forced upon him. Her report noted that Trueblood had a history of aggressiveness and violence, but concluded that

he would likely be "much less aggressive" if he were not around his family and not in "intimate relationships, which call into question his insecurity, dependency and vulnerability...."

8. Dr. Curfman evaluated Trueblood for a "history of seizure disorder." As part of his evaluation, he had a magnetic resonance image (MRI) scan and 21 channel EEG done on Trueblood. Both yielded normal results.

9. Drs. Loughead and Black were retained to perform a psychological evaluation of Trueblood. Dr. Black's primary task was "to talk with family and friends and gather information on family background, upbringing, so on and so forth." Dr. Loughead primarily spent his time interviewing Trueblood "and bring[ing] that information into play." Drs. Loughead and Black jointly prepared a fourteen page report that was admitted at the sentencing hearing. The report delved into Trueblood's family background and his mental status based on the evaluation of three different psychological tests. The report concluded that Trueblood was "not experiencing a psychotic disorder," but that he "partially meets the criteria" for borderline and antisocial personality disorders.

neuropsychologist.[10] Drs. Follingstad and Loughead testified during the sentencing phase/hearing. In addition, upon oral motion of defense counsel the trial court appointed Dr. Richard Rahdert, a psychiatrist, and Dr. Brian Primeau,[11] a clinical psychologist, to examine Trueblood days after his second guilty plea to evaluate his competency to stand trial on the death counts.[12] In addition to this expert testimony, trial counsel also called eleven other witnesses, most of whom were Trueblood's relatives.

Trueblood's brief summarizes with approval the postconviction court's findings relating to his brain dysfunction as affecting "his ability to problem solve, reason, extrapolate, and understand. . . . Trueblood has a problem with his visual spatial reasoning and is more distractible than normal people. Finally, . . . Trueblood has trouble seeing options, difficulty weighing alternatives or options, difficulty generating alternative ideas." This finding was based on the testimony of Dr.

Gelbort, who testified at postconviction about various neurocognitive deficits, as well as Dr. Horn, who was hired by the defense before trial but did not testify.

Trueblood argues that trial counsel should have presented the testimony of Dr. Horn and related testimony dealing with his neuropsychological deficits. Although he makes the bold assertion that, "[h]ad this type of mitigation been presented, then the trial court would have found both statutory and non-statutory mitigation related to mental health," the postconviction court, which heard this testimony, found the selection of witnesses to be a strategy call. We agree.[13]

As noted above, trial counsel went to considerable time and expense in investigating possible mental health mitigating evidence through several witnesses. Trueblood contends that the decision not to call Dr. Horn "was uninformed and could not be a matter of strategy," because it was based either on lack of knowledge or on the failure to con-

---

10. Dr. Horn's neuropsychological testing indicated that Trueblood had "general intelligence in the low end of the Average range" and showed "intact attention and concentration, memory and language functioning, and visual/spatial functioning." Dr. Horn's report also noted "areas of relative cognitive weakness" on tasks that require "planning, conceptualization, and flexibility of approach," but observed that Trueblood would remain "calm, patient, and persistent" when he became stuck and was unclear how to proceed with problem-solving. Dr. Horn's report concluded that Trueblood had "mild difficulty in right hemisphere functioning, although some bilateral involvement is a possibility. This problem is mild, likely of a longstanding nature, and not progressive. The picture is compatible with a chronic seizure disorder."

11. We are uncertain of the proper spelling of this name. The trial record includes a report signed by "Brian E. Premo," but when called at the postconviction hearing the transcript reflects that the witness provided the spelling "Primeau."

12. Both concluded that Trueblood was competent. Dr. Primeau wrote that Trueblood "appears of above average intelligence and seems to have a very good understanding of his situation and an appreciation for the subtleties of human psychology. He seems to have a good insight into himself and overall intact judgment. . . . There is no evidence that he is suffering from any serious mental illness." Dr. Rahdert wrote that Trueblood indicated that he "understood the progress of events at his trial, that he was willing to accept advi[c]e given him by his attorney and

appeared to have thought out rationally his decision to plead guilty. . . . Trueblood was oriented to time, place, and person and he did not demonstrate any thought disorder suggestive of a psychotic illness. . . . He was average in intelligence. His ability to think through problems and to think abstractly was reasonable."

13. As part of his ineffective assistance of counsel argument, Trueblood also contends that the postconviction court "found the existence of a mental illness, but gave it no weight." The postconviction court found that:

[t]he evidence in this case shows that while the Petitioner was suffering from some mental disorder or brain dysfunction . . . such mental disorder or brain dysfunction would not rise to the level of . . . being [a] sufficient mitigating circumstance[] to justify as a matter of law, an ineffective assistance of counsel claim for failure to present that evidence.

The postconviction court was assessing the impact of the alleged omissions of trial counsel on the trial court's sentencing. Trueblood's citation to *Mayberry v. State*, 670 N.E.2d 1262, 1271 (Ind.1996), a direct appeal in which we held that a trial court abused its discretion by refusing to find mental illness as a significant mitigating factor, is misplaced in the context of postconviction. The only issue before the postconviction court was trial counsel's alleged ineffectiveness for failing to present evidence of Trueblood's brain dysfunction, and the postconviction properly considered the relative insignificance of that evidence as it related to his ineffectiveness claim.

duct a proper investigation. Both trial counsel rebutted this. Each testified that Dr. Horn's testimony was not presented because of an anticipated conflict with the testimony of Dr. Follingstad.[14] Trueblood contends that trial counsel should have consulted the experts regarding the potential conflict, concluded there was no conflict, and presented the testimony of Dr. Horn. This decision is plainly a judgment call that does not rise to the level of constitutionally deficient performance.

■ Trueblood also argues that trial counsel were ineffective for failing to present evidence suggesting that he may have been suffering from post-traumatic stress disorder (PTSD). The postconviction court found

> [t]here is no evidence before the court that there was any indication to trial counsel that they should have been aware of that issue, that they knew of that issue, or that it was an issue which should be looked into.... Other experts in the mental health field who examined the Petitioner were not aware o[f] any post-traumatic stress disorder or even any symptoms or indication that there might be a problem.... Even if there might have been symptoms of post-traumatic stress disorder, there is no evidence before the court that it substantively affected Petitioner's ability to participate in [his defense].

Trueblood asserts that the State presented no experts qualified to challenge his postconviction expert's finding of PTSD and that some of the expert testimony available to trial counsel prior to sentencing suggested symptoms of PTSD. As explained above, trial counsel hired several experts to prepare miti-

gating evidence for the penalty phase and sentencing hearing. If none of those experts told trial counsel that Trueblood was, or may be, suffering from PTSD, counsel cannot be declared ineffective for failing to pursue the issue further.

■ Trueblood also contends that trial counsel were ineffective for failing to present "eyewitness testimony" relating to an incident in which he saved a woman's life by pulling her from a burning building.[15] Trial counsel presented evidence of this event in mitigation through the unverified hearsay testimony of both of Trueblood's parents. We held on direct appeal that this testimony "was admissible under the evidentiary standards applicable to sentencing hearings but the trial judge was not obliged to credit it. The trial court did not err in failing to find this as a mitigating circumstance." *Trueblood v. State*, 587 N.E.2d 105, 111 (Ind. 1992). Trueblood argues in this appeal that counsel should have presented the testimony of his wife who witnessed the rescue.[16] However, he concedes that trial counsel did not know that she had witnessed the rescue. Moreover, trial counsel presented admissible evidence in support of this potentially mitigating factor. The failure to discover and present direct eyewitness testimony is not deficient performance. Nor is there a reasonable probability that its presentation would have changed the trial court's decision to impose the death sentences.

■ Trueblood also contends that trial counsel should have sought a change of judge after his unsuccessful attempt to withdraw his second guilty plea led the trial judge to

14. This conclusion was based in part on written reports prepared by two experts retained by the State to review the defense expert's reports. The State's reports were provided to defense counsel in the course of discovery. One of the State's experts observed that the deficits noted in Dr. Horn's report "can only hinder the defendant's response to psychological treatment. In addition, given that these deficiencies are apparently organic in nature, they are not subject to significant remediation." Based on the information before it at the time, trial counsel concluded that there was a conflict between the likely testimony of Dr. Follingstad and Dr. Horn. They decided to call Follingstad and not Horn.

15. This Court recently upheld a postconviction court's finding that defense counsel were not ineffective for failing to present evidence that the defendant once saved another person's life. *See Williams v. State*, 706 N.E.2d 149, 157–58 (Ind. 1999). In this case, defense counsel presented evidence of Trueblood's act, albeit perhaps not in the best form.

16. Trueblood also included pictures, newspaper articles, and fire department logs and notes regarding the fire in the postconviction record of proceedings. He does not specifically argue that trial counsel were ineffective for failing to submit these items, and we hold that they were not.

state on the record that he believed Trueblood was "lying" and his changed testimony was "a counterfeit." However, Trueblood does not argue that, had a change of judge been requested, it would have been granted. More importantly, trial counsel O'Brien testified in his postconviction deposition that he and O'Reilly wanted the case to remain before Judge Melichar. "We had a lot of faith in Melichar." Even after he called Trueblood a "counterfeit" and denied the motion to withdraw the second guilty plea, "we still felt that he would be . . . our best opportunity or the best judge." Trueblood points to nothing rebutting the presumption of competence in this evaluation.

■■■ Trueblood next argues that trial counsel were ineffective for failing to "adequately prepare the mitigation witnesses[.]" He asserts that had trial counsel better prepared witnesses who testified about his good conduct in jail while awaiting trial that this Court would have not concluded "[t]his evidence does not compel a finding of good behavior as mitigation." *See Trueblood*, 587 N.E.2d at 110. Trueblood offers no specifics as to what should have been done differently. Moreover, we reviewed this testimony on direct appeal and noted that two of three corrections officers who testified had "had problems" with Trueblood on one or two occasions. *Id.* Trueblood does not contend that calling other witnesses would have contradicted this negative testimony or that trial counsel could have somehow prepared the witnesses in a manner to keep this information from the trial court. There is no deficient performance here.

■■■ Trueblood also contends that trial counsel either did not interview, adequately prepare, or present other witnesses. Many of these witnesses were, however, in-

terviewed by either Trueblood's mitigation expert or trial investigator. Trueblood suggests that a more thorough investigation or the presentation of additional witnesses would have revealed more detailed information about Trueblood's family background and abusive childhood. Trial counsel presented a substantial body of evidence on this subject. In addition to expert testimony of Drs. Follingstad and Loughead, trial counsel presented the testimony of both of Trueblood's parents, Trueblood's sisters Elaine and Kelly, his brother David, his brother-in-law, his "ex-brother-in law," and a man who had known Trueblood since he was born. The trial court's sentencing order found as a mitigating circumstance that Trueblood "was abused as a child and raised in an environment of physical and emotional abuse." Some improvement can be found in hindsight in any trial presentation. The deficiencies argued by Trueblood in this appeal do not approach the showing necessary to overcome the strong presumption of counsel's competence. Moreover, Trueblood points to nothing to lead us to believe that more of this same sort of evidence would have affected the sentence.[17]

■■■ Trueblood also asserts that trial counsel were ineffective for failing to object to the State's rebuttal testimony by a detective regarding Trueblood's juvenile record.[18] However, the sentencing order makes no mention of a juvenile record and even lists as a mitigating circumstance that the "defendant has no significant history or prior criminal conduct." A few weeks after the detective testified, the probation officer who prepared the presentence report filed an addendum that stated he had found no juvenile

17. Although this argument deals almost exclusively with evidence relating to family background and childhood abuse, Trueblood also includes the failure to call Trueblood's landlord, who could have testified (1) that he saw Trueblood patiently taking care of a child earlier on the day of the killings and (2) that Susan had left Trueblood several times but always came back. He also suggests that trial counsel should have elicited from his employer, who was called to testify for the State at sentencing, that he was a good employee. In light of the extensive mitiga-

tion explained in text above, trial counsel were not deficient for failing to present this additional evidence. Moreover, it is not of the caliber that even remotely suggests the possibility of a different outcome.

18. Trueblood mentions "bad acts" but does not spell out what the unmade objection should have been in the context of a penalty phase where Evidence Rule 404(b) has no apparent application.

criminal history in court records.[19] In light of the trial court's finding of a lack of criminal history, Trueblood has not demonstrated any prejudice by counsel's failure to object, even if the unspecified ground for objection were valid. *Cf. Prowell v. State*, 687 N.E.2d 563, 565 (Ind.1997), *cert. denied* —— U.S. ——, 119 S.Ct. 104, 142 L.Ed.2d 83 (1998) (concluding that any error in admitting victim impact evidence was harmless under Trial Rule 61 because the trial court's sentencing order did not refer to any victim impact evidence).

■■■ Trueblood similarly argues that trial counsel were ineffective for failing to raise objections to hearsay accounts of Trueblood's prior domestic abuse of Susan. He points to two specific instances in which he alleges that trial counsel improperly elicited alleged hearsay. On the first of these, counsel asked a friend of Susan's whether the friend's testimony of domestic abuse had been a recitation of what Susan had told her, rather than something she had witnessed herself. On the second, counsel asked Susan's brother's girlfriend if Susan had ever related any threats against her or her children. Trial counsel asked both of these questions in an attempt to minimize the testimony of domestic abuse by showing that (1) the witness had not directly witnessed the abuse but was relating it secondhand and (2) although Trueblood may have abused Susan, he had not threatened her or her children. Moreover, hearsay testimony was admissible during sentencing hearings under the law existing at the time of Trueblood's sentencing hearing. *See, e.g., Letica v. State*, 569 N.E.2d 952, 957 (Ind.1991).[20]

■■■ Trueblood also provides a five page single-spaced list of "extensive mitigation" in his case. Much of the list relates to Trueblood's childhood and was considered by the trial court when it found as a mitigating circumstance that "[t]he defendant was abused as a child and raised in an environment of physical and emotional abuse." Some of the additional factors are not mitigating at all.[21] Trueblood neither provides any citation to authority nor makes a cogent argument as to why the remaining circumstances should have been presented differently or at all. Any claim of error is waived. *See* Ind. Appellate Rule 8.3(A)(7).

## II. Ineffective Assistance of Appellate Counsel

■■■ Trueblood also argues that his appellate counsel rendered ineffective assistance on direct appeal. Trial counsel O'Brien and O'Reilly also served as appellate counsel. Trueblood alleges four errors: (1) failure to "compile and file an adequate record" of proceedings; (2) failure to challenge the "gruesome" slides of the children that were presented at trial; (3) failure to challenge the State's use of hearsay testimony in rebuttal; and (4) issues relating to sentencing including (a) the trial court's failure to consider mitigating evidence; (b) the absence of an aggravating circumstance to support the death sentence for Susan's murder; (c) failure to challenge adequately the trial court's reliance on non-statutory aggravating circumstances; and (d) the proportionality and appropriateness of his sentence.[22] Trueblood also asks that we consider the cumulative effect of these issues.

---

**19.** The trial court initially stated that it was only considering what was in the probation officer's report, but then stated that it was considering all of Trueblood's "history from childhood to adulthood[.]"

**20.** Hearsay remains admissible at sentencing hearings under the Indiana Rules of Evidence as well. *See* Ind. Evidence Rule 101(c)(2) (rules of evidence, other than those with respect to privileges, do not apply to sentencing hearings).

**21.** For example, one section of this summary is captioned "victim" and notes that Susan was from a dysfunctional home, was confused, "de-

pressed, had low self esteem and was real isolated." These personal characteristics of the victim in no way mitigate Trueblood's killing of her and her children. Nor does the fact that Trueblood, at the approximate age of 23, "lost his dog that was very close to him . . . ."

**22.** Trueblood also contends that "appellate counsel failed to brief appropriate state and federal constitutional authority and argument and failed to include relevant case law." He points to no specific authority or argument that should have been included. This claim is waived. *See* Ind. Appellate Rule 8.3(A)(7).

■ The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel. *Lowery v. State*, 640 N.E.2d 1031, 1048 (Ind.1994). As to the adequacy of the record, Trueblood's argument consists of one sentence: "Appellate counsel failed to compile and file an adequate record for this Court's review." He expands only slightly in his reply brief by quoting from a hearing on his trial counsel's oral motion to allow Trueblood to visit the victims' gravesite. It is unclear how this transcript relates to any issue raised on direct appeal, and Trueblood does not explain how it gives rise to any other issue that should have been raised.[23]

■ Trueblood next contends that appellate counsel should have challenged the State's presentation of "gruesome ... slides of the decomposing and bloated nude children...." Trueblood argues that the gruesomeness of the slides rendered him unable to sit through their presentation a second time and their use "broke his will to challenge the State's case." Because Trueblood was not convicted at trial but rather pleaded guilty, whether or not these photographs were properly admitted during a trial that was never completed is relevant only to the extent that it bears on the voluntariness of Trueblood's guilty plea. This issue was properly raised for the first time at the post-conviction hearing. It could not have been raised on direct appeal. *See Prowell v. State*, 687 N.E.2d 563, 564 n. 1 (Ind.1997) ("when a defendant pleads guilty, he may challenge only *sentencing* errors on direct appeal, not alleged errors involving his guilty plea or

conviction") (citing *Tumulty v. State*, 666 N.E.2d 394 (Ind.1996)) (emphasis in original). Therefore, appellate counsel cannot be declared ineffective for raising a claim that this Court would not have considered.

Trueblood also argues that appellate counsel failed to challenge the State's improper use of hearsay in its rebuttal case. He provides no citation to the record or authority and develops no argument beyond referring us to his contentions as to his trial counsel's failure to object to evidence of domestic abuse. This contention was resolved against him in Part I.B. of this opinion. For the same reasons, the failure to raise this claim on direct appeal was not appellate ineffectiveness.

Trueblood also raises appellate counsel's handling of some sentencing issues.[24] First, he contends that if his "mitigation had been adequately presented at trial and on appeal, then Trueblood would not be facing the death penalty." The claim of trial counsel ineffectiveness for failing to present mitigating evidence was resolved against Trueblood in Part I.B. of this opinion. As a result, he cannot succeed in a claim of appellate ineffectiveness for failure to argue that trial counsel were ineffective for failing to present more mitigating evidence.

■ Trueblood's free-standing claim of sentencing error suggests that appellate counsel should have argued the mitigating evidence presented at the sentencing hearing differently. Specifically, Trueblood argues that the trial court failed to consider his guilty plea as a mitigating circumstance.[25]

23. The issue arguably relates to a claim of trial counsel ineffectiveness, a claim which was unavailable on direct appeal because trial counsel were appointed as appellate counsel.

24. At the time of the offense, a capital sentencing order was required to (1) identify each aggravating and mitigating circumstances found; (2) state the specific facts and reasons for each; and (3) articulate that the circumstances were evaluated and balanced in determination of the sentence. *Benirschke v. State*, 577 N.E.2d 576, 579 (Ind.1991). The sentencing order complied with *Benirschke*.

25. Trueblood also lists other factors that he asserts were not considered by the trial court at sentencing. These include: "the circumstances

of Trueblood's life; the family history of substance abuse; the circumstances of the offense; Trueblood's mental and emotional condition; [and] Trueblood's lack of future dangerousness." He provides no citations to the record or to authority and develops no argument in regard to these issues. Rather, he states that "[t]hese mitigating circumstances are more fully cited in [his] final amendment to his post-conviction petition, [R 1514–1529]. Space limitations do not allow a more in-depth treatment here." We fail to see why these issues, if deemed significant enough to warrant this Court's review, were not cogently argued in Trueblood's 118-page brief. Any claim of error regarding these issues is waived. *See* App. R. 8.3(A)(7).

Although the legislature has not identified a defendant's decision to plead guilty as a statutory mitigating circumstance in either the death penalty statute or the general sentencing statute, see IND.CODE §§ 35–50–2–9(c) & 35–38–1–7.1(c) (1998), Trueblood is correct that Indiana courts have recognized that a guilty plea is a significant mitigating circumstance in some circumstances. *See, e.g., Widener v. State,* 659 N.E.2d 529, 534 (Ind. 1995); *Scheckel v. State,* 655 N.E.2d 506, 511 (Ind.1995); *Singer v. State,* 674 N.E.2d 11, 18 (Ind.Ct.App.1996).

■ In an era of crowded court dockets and a limited number of judges to hear those growing dockets, defendants who plead guilty save valuable judicial time and resources. Moreover, a guilty plea saves the State the time and expense inherent in a lengthy trial such as this would have been. It accordingly extends a benefit to the State and the victim's family by avoiding a full-blown trial, as well as demonstrating the defendant's acceptance of responsibility for a crime. *See Scheckel,* 655 N.E.2d at 511. Nevertheless, this determination is necessarily fact sensitive, and not every plea of guilty is a significant mitigating circumstance that must be credited by a trial court.

After entering the pleas, Trueblood later sought to withdraw from both guilty pleas. The second guilty plea involved Trueblood's recantation of the sworn version of events given in court during the guilty plea hearing and did not occur until after several days were spent selecting a jury and the State had presented several witnesses. Although the guilty pleas saved some trial court and State time and expense, the benefits were much less than that of the typical guilty plea that

occurs before a trial is scheduled to begin. The plea saved virtually no preparation time for the State. The variations in Trueblood's story and attempts to withdraw his guilty pleas understandably frustrated the trial judge. Moreover, one of the issues presented to this Court on direct appeal was that the trial court erred in refusing to allow Trueblood to withdraw his guilty plea. *See Trueblood v. State,* 587 N.E.2d 105, 107 (Ind. 1992). It would have been highly inconsistent to argue in the same brief that the same guilty pleas that the trial court erroneously refused to vacate should be considered as a mitigating circumstance. Although Trueblood plainly had the right to challenge the guilty pleas, in doing so he refused to take responsibility for the offenses. In sum, appellate counsel were not deficient for failing to raise this issue on direct appeal, and Trueblood has not demonstrated any prejudice as a result of this omission.[26]

■ Trueblood next argues that the trial court failed to specify at least one aggravating circumstance in support of imposing the death penalty for Susan's murder, and appellate counsel were ineffective for failing to raise this issue. The trial court's sentencing order lists only three aggravating circumstances, none of which applies to Susan's murder.[27] Although this issue was not raised on direct appeal, our direct appeal opinion noted that "[t]he aggravator for the death sentence relative to Susan's murder was apparently that Trueblood had committed other murders (those of the children)." *Trueblood,* 587 N.E.2d at 111 n. 7 (citing IND.CODE § 35–50–2–9(b)(8)). Although the sentencing order erroneously omitted that Trueblood had committed or been convicted of the murders of the children,[28] the convictions were undis-

26. Nor were trial counsel ineffective for failing to raise the issue before the trial court. Under the circumstances explained above, the trial court would not have been compelled to make a finding of mitigation. Moreover, even if the trial court had found the guilty pleas to be a mitigating circumstance, there is not a reasonable probability that they would have tipped the scales in favor of a term of years sentence rather than death.

27. (1) Ashleyn was less than twelve years old; (2) William was less than twelve years old; and (3)

defendant had been "convicted of another murder, namely, Susan [Bowsher] Hughes."

28. Trueblood was charged under Indiana Code § 35–50–2–9(b)(8) with having "committed" other murders. However, the sentencing order found that Trueblood had been "convicted" of another murder, the death penalty aggravator found at Indiana Code § 35–50–2–9(b)(7). Trueblood's guilty pleas demonstrate both that he committed and was convicted of other murders. Trueblood has demonstrated no prejudice by the failure of appellate counsel to raise this issue on direct appeal. *Cf. Lowery,* 640 N.E.2d at 1046

puted and plainly apparent on the face of the record. Under these circumstances, had this issue been raised on direct appeal, this Court could have remanded the case to the trial court before issuing an opinion to require it to articulate the statutory aggravator(s) in support of its decision to impose the death penalty for Susan's murder. *See, e.g., Benirschke v. State,* 577 N.E.2d 576, 579 (Ind. 1991) (this Court issued a writ of certiorari to trial court to articulate "its findings that it had made independent judgments as required" and to "indicate[ ] the evaluation given to mitigating circumstances"). The trial judge would certainly have rectified its omission, and this Court would have similarly affirmed the death sentence as to Count III. Trueblood has failed to demonstrate prejudice as the result of appellate counsel's failure to raise this issue on direct appeal.

■ Trueblood also contends that appellate counsel did not adequately challenge the trial court's reliance on non-statutory aggravating circumstances. On direct appeal, Trueblood challenged the trial court's finding as an aggravating circumstance that the murders were "cold-blooded and premeditated." Trueblood did not argue that it was improper to consider this or any other non-statutory aggravating circumstances, but rather argued that this specific factor was not supported by the record. *Trueblood,* 587 N.E.2d at 111. Nearly three years after we issued Trueblood's direct appeal opinion, we held that "[w]hen the death sentence is sought, courts must henceforth limit the aggravating circumstances eligible for consideration to those specified in the death penalty statute, Indiana Code Section 35–50–2–9(b)." *Bivins v. State,* 642 N.E.2d 928, 955 (Ind. 1994). Because our holding in *Bivins* was not based on statutory construction but rather was a new rule of state constitutional law, we held that it would not be applicable to cases on collateral review. *Id.* at 956. Accordingly, Trueblood is not entitled to the retroactive benefit of *Bivins.* Moreover, appellate counsel cannot be held ineffective for failing to anticipate or effectuate a change in the existing law. *See Harrison v. State,* 707 N.E.2d 767, 776 (Ind.1999).

■ Because *Bivins* is not retroactive, Trueblood's claim that the trial "court found two mitigating circumstances and then expressly weighed them against non-statutory aggravators" is similarly without merit. Under the law existing at the time of trial, the trial court could have found Trueblood's "acts of spousal abuse" and "acts of violence during his adult life" as aggravating circumstances.[29] *See, e.g., Minnick v. State,* 544 N.E.2d 471, 482 (Ind.1989) ("as long as at least one of the aggravating circumstances from the death penalty statute is proven and set forth in the sentencing statement, a trial court may find the existence of other statutory aggravators and consider them in regard to capital sentencing"). Therefore, appellate counsel were not ineffective for failing to argue that the trial court erred when it mentioned these acts during its description of mitigating circumstances. Nor were appellate counsel ineffective for failing to challenge the trial court's finding as a mitigating circumstance that Trueblood had "provided less than candid or honest assistance to law enforcement authorities." We disagree with Trueblood's conclusion that "this statement must be considered as a finding of aggravation." Rather, this statement suggests the finding of a mitigating circumstance—"assistance to law enforcement authorities"—tempered by the fact that this assistance was less than candid at times. It is consistent with our mandate that trial courts not only identify mitigating circumstances but also state the facts and reasons that support the mitigating circumstance. Because raising this issue on direct appeal would not have affected this Court's affirmance of the death

(finding no grounds for postconviction relief when trial court read the "commission of another murder" aggravator to the jury and instructed it on that aggravator but "misspoke" by finding that the defendant had been "convicted" of another murder in its sentencing order).

29. Accordingly, Trueblood's claim that trial counsel were ineffective for failing to object to his wife's testifying to non-statutory aggravation in the State's rebuttal case also fails. Trial counsel were not ineffective for failing to make an objection that would have been overruled based on existing law.

sentences, appellate counsel cannot be held ineffective for omitting it.

■ Nor were appellate counsel ineffective for failing to raise a claim that the trial court "used lack of evidence for mitigation as an aggravating circumstance." After listing three statutory aggravating circumstances and five mitigating circumstances, the sentencing order states:

The victims herein did not participate in the murders or consent thereto. The murders committed by defendant were entirely without provocation. There is nothing in the record to indicate defendant was under the influence of any mental, physical or emotional disturbance when he committed the murders.

The trial court then found that the previously mentioned aggravating circumstances outweighed the mitigating circumstances and imposed the death sentences. Trueblood asserts that because the findings quoted above "cannot possibly be considered mitigating, they can only be viewed as aggravating." Sentencing issues are especially fact sensitive and black and white distinctions are oftentimes not possible. It appears that the trial court was merely being thorough by specifically finding that some of the delineated statutory mitigating circumstances suggested by Trueblood at either the sentencing hearing or through his amended version of the killings did not apply to his case. See IND.CODE § 35–50–2–9(c)(3) ("[t]he victim was a participant in or consented to the defendant's conduct"); id. § 35–38–1–7.1(c)(5) ("[t]he person acted under strong provocation"); id. § 35–

50–2–9(c)(2) ("[t]he defendant was under the influence of extreme mental or emotional disturbance when the murder was committed"). Appellate counsel were not ineffective for failing to challenge this part of the sentencing order.

■ As a final point, Trueblood contends that his death sentences are disproportionate under the Indiana Constitution[30] and inappropriate under our case law. These issues were available but not raised in his direct appeal. Accordingly, they are waived on postconviction. Lowery, 640 N.E.2d at 1036–37.[31] Although available as claims of ineffective assistance of appellate counsel, we cannot say that appellate counsel were ineffective for failing to raise these claims. As this Court recently observed in Bieghler v. State, 690 N.E.2d 188, 194 (Ind.1997), appellate courts "should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case. . . ." Appellate counsel raised two claims of sentencing error on direct appeal, and our direct appeal opinion spent two pages of the North Eastern Reporter addressing them. See Trueblood, 587 N.E.2d at 110–11. Counsel were not deficient for failing to raise these issues that were unlikely to succeed in light of the severe nature of the killing of a woman and her two children. Cf. Harrison v. State, 659 N.E.2d 480, 483 (Ind.1995) (affirming death sentence in case involving the killing of two children).[32]

30. Although the caption of Trueblood's argument asserts that his sentence cannot stand under the Eighth and Fourteenth Amendments, he develops no argument based on these provisions and the only federal authority cited is a number of U.S. Circuit Court of Appeals cases that have found certain mitigating circumstances to be significant and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a U.S. Supreme Court case that held "[t]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." Id. at 608, 98 S.Ct. 2954. These authorities do not support the contention that the death sentences in Trueblood's case violate the Eighth or Fourteenth Amendment.

31. Trueblood also raises several claims of alleged trial court error at sentencing in the body of his

trial ineffectiveness argument and references a fuller elucidation of the issues as free-standing claims in a different section of his brief. However, these assertions of trial court error at sentencing were either adjudicated on direct appeal or available and not raised. They are accordingly barred by res judicata or waived. See Lowery, 640 N.E.2d at 1037.

32. We similarly reject Trueblood's contention that his sentence is not "reliable" because evidence regarding his "neurocognitive deficits and his substantial mental illness was not before the sentencing court nor was it available to this Court on direct review." This is also available only as an ineffectiveness claim. As explained in Part I.B., supra, the failure to present this evidence was not ineffective assistance of trial coun-

We find no merit in the individual allegations of appellate counsel ineffectiveness. We similarly conclude the cumulative effect of these alleged errors did not deny Trueblood his Sixth Amendment right to effective assistance of counsel on direct appeal.

### III. Rulings by the Postconviction Court

Trueblood argues that the postconviction court erred in its rulings on summary judgment motions, its summary dismissal of some claims, and other rulings during the course of the postconviction hearing.

#### A. The Summary Judgment Motions and Summary Dismissal of Claims

Several months before the postconviction hearing was scheduled to begin, both the State and Trueblood filed motions for summary judgment on certain issues. After conducting a hearing, the postconviction court granted the State's motion and denied Trueblood's.

■ A postconviction proceeding is civil in nature, and the postconviction rules provide for summary disposition when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Ind. Post–Conviction Rule 1(4)(g); *see also* Ind. Trial Rule 56(C) (summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law). The burden is on the moving party to prove each element of its claim by admissible evidence and to establish that there are no genuine issues of material fact

and that the moving party is entitled to judgment as a matter of law. *State v. Daniels,* 680 N.E.2d 829, 832 (Ind.1997). Once the movant has met this burden, the opponent must respond by setting forth specific facts showing a genuine issue for trial; the opponent may not simply rest on the allegations of the pleadings. *Id.*

■ The State raised several issues in its summary judgment motion.[33] Trueblood argues that the State's summary judgment should have been denied but does not argue any specific genuine issues of material fact and provides no citations to authority suggesting that the grant of summary judgment was in any way improper as a matter of law. Rather, his attack focuses on alleged inadequacies of the State's motion and its paucity of citations to authority. This is not enough. On appellate review from a grant of summary judgment against a party, the nonmoving party has the burden of demonstrating that the grant of summary judgment was error. *Erie Ins. Co. v. George,* 681 N.E.2d 183, 186 (Ind.1997) (citing *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 280–81 (Ind.1994)). Although we carefully assess the trial court's decision to ensure that the nonmoving party was not improperly denied its day in court, *see id.,* Trueblood points to no genuine issues of material fact. Accordingly, he has not met his burden of demonstrating that the postconviction court erred in granting the State's summary judgment motion.

Trueblood's motion sought summary judgment on three issues.[34] As we understand it,

---

sel. Its presentation at trial and on appeal to this Court would not have led us to vacate the death sentences.

**33.** The issues were (1) Trueblood's guilty pleas as to all three murders were knowing, intelligent, and voluntary; (2) Trueblood's challenge to the factual basis for the guilty pleas was barred by the doctrine of res judicata; (3) the trial court did not consider inappropriate matters in imposing sentence; (4) the trial court did not rely on the incorrect standard in denying Trueblood's motions to withdraw his guilty pleas; (5) trial counsel, who had sought to withdraw from Trueblood's case after his failed attempt to withdraw his second guilty plea, were properly appointed to represent Trueblood on appeal; and (6) the trial court did not err when it failed to conduct a

sentencing hearing as to Susan's murder count within thirty days of a demand being filed.

**34.** Those issues are (1) his guilty plea to Susan's murder "was not knowingly, intelligently or voluntarily made;" (2) he was improperly sentenced to death for Susan's murder based on the absence of a valid aggravating circumstance; and (3) "the trial court's improper reliance on nonstatutory aggravating circumstances." After review of the guilty plea transcripts, the postconviction court denied Trueblood's claim regarding the guilty plea on the basis that Trueblood "was adequately advised of his constitutional and statutory rights pursuant to the statute and case law; and that he was adequately advised of the potential penalties for entering his plea to that charge." As to the sentencing claims, the post-

Trueblood's argument in this appeal is not that the postconviction court erred by denying him summary judgment, but rather that it erred by summarily dismissing these claims after the denial of summary judgment. Indeed, Trueblood does not allege the absence of a genuine issue of material fact in relation to any of these issues, nor does he cite any authority or otherwise suggest that he was entitled to judgment on these claims as a matter of law. Accordingly, we have no basis on which to find that the postconviction court erred by denying Trueblood's summary judgment motion.[35]

■ Trueblood also asserts that the postconviction court erred by summarily dismissing many of his other claims.[36] Some of these were held barred either by waiver for the failure to raise them on direct appeal or by res judicata because they were adversely decided against Trueblood on direct appeal. *See, e.g., Lowery v. State,* 640 N.E.2d 1031, 1036–37 (Ind.1994) (explaining waiver and res judicata). In the absence of any specific claim of error, summary dismissal of these claims on the ground that they entitle Trueblood to no relief presents no basis for reversal of the postconviction court. *See* P–C.R. 1(4)(f) ("[i]f the pleadings conclusively show that petitioner is entitled to no relief, the court may deny the petition without further proceedings"); *Robinson v. State,* 493 N.E.2d 765, 767 (Ind.1986) ("when the petition conclusively demonstrates that petitioner is entitled to no relief, a hearing on the matter is unnecessary and the petition may be denied without further proceedings").

**B.** *Exclusion of Evidence at the Postconviction Hearing*

■ At the postconviction hearing, Trueblood attempted to introduce several affidavits from relatives and a family friend. The State objected, and the postconviction court sustained some of the objections to certain paragraphs, mostly on grounds of relevance or cumulativeness. Trueblood argues that the postconviction court erred in excluding these items, which he contends contain potentially mitigating evidence.

■ Trueblood characterizes the excluded evidence as "concerning sexual abuse/molestation of the Trueblood boys at the hands of a family friend and the effects of that abuse."[37] The family friend briefly lived with his girlfriend in the Trueblood's home in 1971. The excluded part of the friend's affidavit dealt with alleged encounters with Trueblood's brothers. As such it was of minimal relevance to the claim of ineffective assistance of counsel before the postconviction court. Sexual abuse of Trueblood's brothers is not a mitigating factor, and the only mention of Trueblood in any of these affidavits is the contention that the friend patted him and his brothers "on the head and on the ass." Under these circumstances, the postconviction court did not abuse its discretion by excluding this evidence.

■ Trueblood also argues that the postconviction court erred by excluding two affi-

conviction court denied summary judgment on the basis that these claims had been considered by this Court on direct appeal and were therefore barred by the doctrine of res judicata.

**35.** As a practical matter, we observe that the asserted grounds for summary judgment were not available to Trueblood as free-standing claims at postconviction, but rather only as they related to trial or appellate counsel's effectiveness or the voluntariness of the guilty plea.

**36.** The summarily dismissed claims include such things as (1) unreliability of information in the presentence report; (2) failure to promptly transcribe the record; and (3) alleged denial of the right to trial by jury because after the guilty pleas the penalty phase was conducted without the intervention of a jury.

**37.** Trueblood also contends that the postconviction court excluded evidence concerning his father's "brutality towards his family and its effects." However, he provides no citation to the record or to authority and develops no cogent argument. Any claim of error is waived. *See* Ind. Appellate Rule 8.3(A)(7). Moreover, the trial court found as a mitigating circumstance that "[t]he defendant was abused as a child and raised in an environment of physical and emotional abuse." Absent an argument to the contrary, we fail to see how the excluded evidence was not cumulative and therefore how it was relevant to a claim of trial counsel ineffectiveness for the failure to present mitigating evidence when enough mitigating evidence was presented to warrant the trial court's finding of mitigation.

davits offered by him in rebuttal.[38] The first was from Dr. Michael Clark, the pathologist who supervised the autopsy of Susan. The affidavit commented on the findings from the autopsy report that there was semen in Susan's vagina and no injury to the vaginal area. Dr. Clark's affidavit concluded that there was no reliable way to determine whether the sperm found in Susan's vagina was deposited before or after death but that "[i]ntercourse occurring after death usually causes some injury to the vaginal area." Trueblood contends that this affidavit was offered to "discredit[ ] the State's theory that the defense's failure to test the semen was a strategy decision." This referred to defense investigator Lindblom's testimony at postconviction that defense counsel chose not to have the semen tested because (1) it might not have been Trueblood's and (2) if it turned out to be Trueblood's the State could claim that Trueblood had raped Susan or that the semen had been deposited post-mortem. Although this affidavit arguably negated the factual predicate for one of Lindblom's alternative reasons for concern, it left the other undisturbed. The postconviction court was within its discretion in ruling that this evidence did not rebut anything the State presented.

■ The second excluded affidavit was from Dr. Follingstad who had testified for Trueblood at his sentencing hearing. The postconviction court denied admission of all but one paragraph of the affidavit on the basis that it was not rebuttal. Rather, in the postconviction court's view, it was "mainly

submitted to supplement and support the theory of post traumatic stress," which was part of the case in chief. Trueblood contends that the affidavit was offered to rebut the testimony of Dr. Primeau and Dr. Rahdert who he contends were called by the State to show that he did not exhibit signs of PTSD. However, in an earlier section of his brief he asserts that both observed PTSD symptoms.

> [Dr.] Primeau acknowledged that Trueblood reported that he slept poorly because he had nightmares, a symptom Primeau associated with PTSD. Primeau wishes he had explored the nightmares more with Trueblood. [Dr.] Rahdert also conceded that Trueblood "must have had nightmares at the time, which some people with posttraumatic stress disorder do have. The re-living of the event." The State's witnesses observed symptoms of PTSD in Trueblood.

We agree with the postconviction court that Dr. Follingstad's affidavit should have been submitted as part of the case in chief, if at all. The postconviction court did not abuse its discretion by excluding it.

### IV. The Guilty Pleas were Voluntary and Intelligent

■ As a final point Trueblood argues that the postconviction court erred when it did not vacate his guilty pleas as involuntary. This claim could not have been raised on direct appeal and is properly raised through a petition for postconviction relief. *See Jones v. State*, 675 N.E.2d 1084, 1089–90 (Ind.1996).[39]

Trueblood did not designate an expert deposition, medical report, or any other materials to raise the existence of genuine issue of material fact. In this appeal he asserts that "at the time of the post-conviction court's summary dismissal, the court had before it only the extremely limited portion of the trial record that Trueblood and the State attached to their respective summary judgment pleadings...." If additional materials gave rise to the existence of a genuine issue of material fact, Trueblood was required to designate those materials in order to avoid the trial court granting summary judgment for the State. *See State v. Daniels*, 680 N.E.2d 829, 832 (Ind.1997). He did not. Based on the designated evidence before it, the postconviction court's grant of summary judgment was proper.

---

38. No party addresses whether the affidavits were admissible in view of Evidence Rule 801, so we assume that there was some proper basis for offering the evidence in the form of affidavits. Although the rules and statutes applicable in civil proceedings apply to postconviction proceedings, the postconviction rules specifically provide that "[t]he court may receive affidavits, depositions, oral testimony, or other evidence...." P–C.R. 1(5)

39. As noted in footnote 33 *supra* and accompanying text, the postconviction court granted summary judgment for the State on this claim. Nevertheless, Trueblood was able to present additional evidence in support of this claim as part of his ineffective assistance of counsel claim. *See* Part I.B., *supra*. In responding to the State's summary judgment motion, however,

■ Broadly stated, Trueblood's argument is that his "mental health deficits" impacted his judgment and decision-making abilities to such an extent as to "profoundly undermine" his ability to enter into a constitutionally adequate guilty plea. He points to neuropsychological deficits that he argues impact his ability to solve problems, reason, extrapolate and understand. He also relies on the postconviction testimony of Pamela Porter, who testified that he was suffering from PTSD. He argues that PTSD diminishes his ability to concentrate and think clearly and profoundly impacts his ability to trust individuals. He contends that the combination of these deficits and the circumstances surrounding his guilty pleas rendered the guilty pleas involuntary and unintelligent.

Trueblood asserts that, at the time of the first guilty plea, defense counsel Wilder "had no idea of the State's case," due to a failure to investigate. Moreover, he asserts that the guilty plea was the product of Wilder's "agenda" to persuade him to plead guilty immediately and thus Wilder "exploited Trueblood's deficits" in pursuing that agenda. Finally, Trueblood asserts that Wilder was unaware of the possibility of the death sentence, and failed to convey that possibility to Trueblood, and that Trueblood believed, in light of his conversations with others, that he would serve no more than fifteen years in prison if he pleaded guilty to Susan's murder.

Trueblood contends that the second guilty plea was involuntary because it occurred immediately following two days of the State's presentation of evidence, which included several "very graphic" or "gruesome" crime scene and autopsy photographs. Trueblood was "visibly shaken" by these photographs and requested to be excused while the remaining photographs were shown. Trueblood argues that, because of his neurocognitive deficits, he "did not have the mental and emotional capacity to deal with the quickly unfolding situation before him." Moreover, his "PTSD impaired his ability to concentrate and think clearly where the subject matter triggered sensations from the trauma."

■ Indiana Code § 35–35–1–2(a) requires trial courts, before accepting a guilty plea, to determine that the defendant (1) understands the nature of the charges; (2) has been informed that his guilty plea effectively waives several constitutional rights including a public and speedy trial by jury, confrontation of witnesses, compulsory process, and proof of guilt beyond a reasonable doubt without self-incrimination; (3) has been informed of the maximum and minimum sentences for the crime charged; and (4) has been informed that if the court accepts a plea agreement it is bound by its terms. If this statute is followed in textbook or near-textbook fashion, as it was in this case, a defendant faces a high burden in establishing a lack of voluntariness. *State v. Moore,* 678 N.E.2d 1258, 1267 (Ind.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 1528, 140 L.Ed.2d 678 (1998); *see also White v. State,* 497 N.E.2d 893, 905 (Ind.1986) ("A plea entered after the trial judge has reviewed the various rights which a defendant is waiving and made the inquiries called for in the statute is unlikely to be found wanting in a collateral attack."). However, defendants who can show they were coerced or misled into pleading guilty by the judge, prosecutor or defense counsel present a colorable claim that their plea was not voluntary. *Moore,* 678 N.E.2d at 1266 (citing *White,* 497 N.E.2d at 905–06). We review all the evidence before the postconviction court, including the testimony at the postconviction hearing, the transcript of the petitioner's original sentencing, and any plea agreement or other exhibits that are part of the record. *White,* 497 N.E.2d at 905.

At both guilty plea hearings, Trueblood stated that he was not suffering from any mental or emotional disability and that his pleas were free and voluntary.[40] This satisfied the statutory requirement that a trial court may accept a plea of guilty only after determining whether "any promises, force, or threats were used to obtain the plea." IND. CODE § 35–35–1–3(a) (1998). Moreover, as explained in Part I.B. *supra,* Trueblood was

---

40. Trueblood also responded affirmatively when asked if he was satisfied with the services of his attorneys.

examined by Dr. Davis before the first guilty plea and several other mental health experts before the second plea. The postconviction court found that

> [p]sychologists and psychoneurologists and others and a thorough examination of the mental health of the Petitioner was conducted. All of the issues were considered that could be considered both in regard to the Petitioner's mental health at the time of the commission of the crimes and [at] the time of the submission of the guilty pleas. There is nothing about any of the findings of any of the mental health experts which either alone or in combination with other factors would render the Petitioner incompetent to enter a plea or which would render any of his pleas unknowing, involuntary, or unintelligent.

According to Trueblood's brief, his "greatest difficulties lie in his complex reasoning, especially processing non-verbal information." The guilty plea hearings and discussions with counsel preceding those hearings were verbal. There was no written plea agreement involved in either guilty plea and the trial court orally advised Trueblood of the charges against him and the rights being given up by pleading guilty. Whatever the effects of Trueblood's exposure to graphic photographs and listening to his twin brother's testimony against him, he did not persuade the postconviction court that these events rendered him incapable of entering into the second guilty pleas intelligently and voluntarily. That determination is certainly not clearly erroneous in light of the fact that this plea occurred the morning after this evidence was presented and after lengthy discussion with counsel that evening.

■ In addition to the contentions addressed in Part I that trial counsel had not conducted an adequate investigation at the time of the plea,[41] Trueblood also suggests that Wilder's actions coerced him into pleading guilty. In support of this contention, Trueblood cites to an in-chambers hearing regarding his request to visit the victims' gravesite. Without citation to the record, he asserts that he asked to visit the cemetery to pay his last respects but that Wilder instead had him taken to the place where he allegedly buried the bodies, which "re-traumatized" him and caused his trust in Wilder to be "shattered." Wilder's affidavit refers to the gravesite as "where the bodies had been buried," and indicated that the visitation there was necessary to meet Trueblood's "urgent and at times emotional requests for such a visitation." The affidavit clearly indicates that this request was in addition to any request to visit the cemetery. Moreover, defense investigator Lindblom testified at postconviction that his recollection was that Trueblood wanted to visit the site "where he last had contact with [the victims], which was the one where he buried them." Trueblood's contention is not supported by the record and there is no other evidence that Wilder in any manner coerced his guilty plea.

■ Trueblood also asserts that he believed, in light of his conversations with Wilder and others, that he would be serving no more than fifteen years in prison as a result of the first guilty plea. However, a "mere hope for a certain outcome at sentencing, without more, does not suffice to set aside a guilty plea for lack of voluntariness." *Moore*, 678 N.E.2d at 1267. Rather, we look to the entire record and note that Trueblood was specifically advised at the conclusion of the guilty plea hearing that he could be sentenced to death for Susan's murder.[42]

41. Although Trueblood expands on the ineffectiveness argument, this allegation is not supported by the record. The postconviction record contains several transcribed witness statements taken by the investigator from the public defender's office within days of the murders. As explained in Part I.B. *supra,* the defense also retained Dr. Davis to evaluate Trueblood within that same time period. The trial record also shows that defense counsel took several depositions before the first guilty plea, as well as being advised of nineteen taped/transcribed statements taken by the police and scores of physical exhibits relating to the case.

42. Trueblood argues that he "was never specifically advised of the sentencing ramifications of his plea.... The trial court failed to specifically advise of the possibility of the death penalty." Near the conclusion of the plea hearing, the deputy prosecutor stated "I think it would behoove the Court to advise the defendant that in this case, one of the potential penalties is death." The trial court responded "[t]hat is a potential penalty." When Trueblood was asked if the pos-

This was consistent with the initial hearing on the death penalty counts at which Trueblood was advised that the State was seeking the death penalty for each of the three murders for which he was charged.

In sum, the postconviction court concluded that the guilty pleas were voluntary and intelligent and refused to vacate them. That determination turned on factual issues and is therefore entitled deference on appeal. *See Harrison v. State,* 707 N.E.2d 767, 773 (Ind. 1999). Because Trueblood has not convinced this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court, *see id.* at 774, we affirm the postconviction court's conclusion that the guilty pleas were voluntary and intelligent.

### Conclusion

The denial of postconviction relief is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

sibility of a death sentence had "any effect on [his] plea of guilty here this afternoon," he responded "No."