

IN THE

# Court of Appeals of Indiana

Madelyn Nicole Howard,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Jul 30 2025, 8:58 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

July 30, 2025

Court of Appeals Case No.
24A-CR-1078

Appeal from the Monroe Circuit Court

The Honorable Darcie L. Fawcett, Judge

Trial Court Cause No.
53C09-2209-F3-822

**Opinion by Judge Pyle**
Judges Weissmann and Felix concur.

**Pyle, Judge.**

## Statement of the Case

Madelyn Nicole Howard ("Howard") appeals, following a guilty plea, her sentence for Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death.[1] Howard argues that: (1) the trial court abused its discretion when sentencing her; and (2) her sentence is inappropriate. Concluding that: (1) the trial court did not abuse its discretion when sentencing Howard; and (2) Howard's sentence is not inappropriate, we affirm the sentence imposed by the trial court.

We affirm.

## Issues

1. Whether the trial court abused its discretion when sentencing Howard.

2. Whether Howard's sentence is inappropriate.

## Facts[2]

---

[1] IND. CODE § 9-26-1-1.1.

[2] One of Howard's appellate issues is an argument that her sentence is inappropriate. An inappropriate sentence analysis requires us to examine a sentence in light of the nature of the offense and the character of the offender. *See* Ind. Appellate Rule 7(B) (providing that our Court may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender). The factual basis set forth in Howard's guilty plea hearing contains mainly a recitation of the elements of her offense. Both parties

[3]     In September 2022, Howard, who was then twenty-two years old and had recently graduated from Indiana University ("I.U.") a few months earlier, was living and working in Bloomington. Howard worked at a research lab and at Kilroy's Sports Bar ("Kilroy's").

[4]     On September 17, 2022, Howard went to a tailgate party before an I.U. football game. During the tailgate party, she drank alcohol. Following the game, she went to her boyfriend's apartment and took a nap. That evening, Howard was going to celebrate a friend's birthday at Kilroy's. Howard and some friends, including Taylor McCullough ("McCollough"), drank some alcohol at a friend's apartment before going to Kilroy's. Howard then drove her Mercedes sedan to Kilroy's around 11:00 p.m.

[5]     When Howard arrived at Kilroy's, she got an alcoholic drink and then went upstairs to a private area where the birthday party was being held. The birthday

---

rely on various sources to support their respective recitation of facts and analysis of Howard's character and the nature of the offense. Specifically, they rely upon testimony and exhibits introduced during Howard's sentencing hearing as well as the toxicology report, the probable cause affidavit, the factual narrative regarding the offense that was set forth by the police and contained within Howard's presentence investigation report ("PSI"), other information within and attached to Howard's PSI, and information within and attached to Howard's presentencing memorandum. We, like the parties, will refer to these sources and her guilty plea transcript to set forth the relevant facts and to review the nature of Howard's offense and her character for her inappropriate sentence argument.

Additionally, we note that Howard, in her reply brief, argues that the State, in its appellee's brief, improperly cited to the factual narrative contained within Howard's PSI (which Howard refers to as the probable cause affidavit). Howard, however, fails to acknowledge that she relied upon and cited to that same factual narrative in her own appellant's brief. Furthermore, we note that the factual narrative contained within Howard's PSI was obtained from Detective Rodgers, who testified during the sentencing hearing and provided the same information that was contained in the factual narrative.

party had "bottle service" where full bottles of alcohol were available for the partygoers to share. (Tr. Vol. 2 at 105).

[6] Around 1:45 a.m. on September 18, 2022, McCollough told Howard that he was going to leave and go home. Howard told McCollough that she would drive him. McCollough's apartment was near Walnut and 20th Streets. Howard and McCollough walked to Howard's car, where she got into the driver's seat, and McCollough got into the passenger seat. Howard then drove northbound on Walnut Street just south of 12th Street. This area was "a very high traffic area[,]" including vehicle and pedestrian traffic. (Tr. Vol. 2 at 93).

[7] At that time and in that same area, Nathaniel Stratton ("Stratton"), who was a twenty-year-old student at I.U., was riding a scooter in the bike lane. Howard veered her car into the bike lane and struck Stratton. The impact between Howard's car and Stratton knocked Stratton's shoe off his foot, shattered Howard's passenger-side windshield, and threw Stratton's body further north on Walnut Street. As Stratton lay bleeding in the street, Howard drove away dragging Stratton's scooter under her car, which caused sparks to fly from the rear of her car.

[8] Howard continued driving north on Walnut Street. As she drove past a Domino's Pizza ("Domino's") on Walnut Street north of 12th Street, her passenger side tires were on the sidewalk. Howard drove on the sidewalk for approximately 220 feet before she returned to the road. Howard continued driving her car northbound on Walnut Street for an additional five blocks and

turned right onto 17th Street. She then drove for two more blocks and turned left onto Lincoln Street. Howard then drove on Lincoln Street for two more blocks and eventually stopped her car at 19th Street. When Howard stopped her car, people who were at a nearby party yelled to Howard that she had a scooter stuck underneath her car. McCollough and some of the partygoers lifted Howard's car and removed the scooter.

[9] Immediately thereafter, officers from the I.U. Police Department arrived at the intersection where Howard had stopped her car and made contact with Howard. An officer from the Bloomington Police Department ("BPD") also arrived at that scene, and the BPD officer spoke to Howard. Initially, Howard told the BPD officer that she did not know how the damage to her windshield had occurred. The BPD officer also spoke with McCollough, who told the officer that after the impact, McCollough had turned to Howard and asked her if she had hit someone. The BPD officer recorded her interview with Howard and McCollough on her bodycam.

[10] Meanwhile, emergency services took the critically injured Stratton to the hospital. A doctor initially called Stratton's parents and told them that Stratton had been "severely injured" and that the doctor was "struggling to keep him alive." (Tr. Vol. 2 at 151). Within two hours, the doctor made a "final call" to Stratton's parents to tell them that, "after five heart failures[,]" Stratton had died. (Tr. Vol. 2 at 151).

[11] Howard consented to a blood draw, and the BPD officer took Howard to the hospital for the draw. While at the hospital, Howard told the BPD officer that she had gotten into a verbal altercation with some girls and that those girls may have damaged her windshield with a bat. The blood test results later revealed that Howard had an alcohol concentration equivalent ("ACE") of .226.

[12] BPD Detective Jeffrey Rodgers ("Detective Rodgers") spoke to Howard around 4:00 a.m. at the police department. Detective Rodgers recorded his interview with Howard on his bodycam. Howard was "very cooperative" during the interview, and Detective Rodgers "had no problem understanding her" and believed that Howard had no problem understanding him. (Tr. Vol. 2 at 104). Detective Rodgers asked Howard "very specific questions" about how the damage to her windshield had occurred. (Tr. Vol. 2 at 103). Howard "was very adamant that the damage [had] not [been] there when she [had] got[ten] into her vehicle after she left the bar." (Tr. Vol. 2 at 104). Howard also stated that she had seen the damage once she had made contact with the police at the intersection of Lincoln and 19th Streets but that she did not know how the damage had occurred. Additionally, Howard told Detective Rodgers that she had been driving McCollough to his apartment, which was located near Walnut Street north of 19th Street. When the detective asked Howard why she had turned on 17th Steet instead of 19th Street, Howard stated that she had "either hit something or [she] was going to where [she] used to live through muscle memory[.]" (Tr. Vol. 2 at 104). Detective Rodgers told Howard that those were two "pretty different things" and for her to clarify which one it was. (Tr.

Vol. 2 at 104). Howard then stated that "she [had] possibly hit something." (Tr. Vol. 2 at 104).

[13] When further speaking with Detective Rodgers, Howard was able to recount details of her day and that evening. Specifically, Howard told Detective Rodgers that she had gone to the football game, had taken a nap after the game, had had "a couple" of alcoholic drinks that evening with friends, and then had driven her friends to Kilroy's. (Tr. Vol. 2 at 104). Howard stated that "as soon as [she] walk[ed] in[,]" she "got her first alcoholic drink" and then went upstairs where her friends were celebrating a birthday. (Tr. Vol. 2 at 105). Howard told Detective Rodgers that her party had "bottle service" where full bottles of alcohol were available for the partygoers to share. (Tr. Vol. 2 at 105). Additionally, Howard told the detective that she had offered McCollough a ride home and that she remembered walking to her car and driving away. Howard then told Detective Rodgers that she remembered stopping her car at Lincoln and 19th and hearing people yelling at her about having a scooter underneath her car. Howard stated that McCollough and the others had lifted her car and removed the scooter and that the police then had arrived. Howard told Detective Rodgers that she had no memory of the collision.

[14] Detective Rodgers also spoke with McCollough about the collision. Detective Rodgers recorded his interview with McCollough on his bodycam. McCollough told the detective that he was nearsighted and had not been wearing his glasses that evening. McCollough stated that as Howard was driving him home, he felt something that "he thought was the glass on his

arms." (Tr. Vol. 2 at 106). McCollough told Detective Rodgers that Howard had asked McCollough if she had hit something and asked what she should do. According to McCollough, he told Howard to stop the car, but she "kept driving for . . . another minute." (Tr. Vol. 2 at 107).

[15] The police obtained a surveillance video from the Domino's ("the Domino's video") that was located on Walnut Street just north of 12th Street. The Domino's video shows a group of people standing at the nearby corner of Walnut Street and 12th Street and multiple cars driving by Domino's. The Domino's video also reveals that, around 1:45 a.m., one of the pedestrians jumped backwards to avoid being hit by Howard's oncoming car. Thereafter, the video shows Howard's car driving on the sidewalk in front of Domino's and then a tennis shoe flying into the air and bouncing on the street. The shoe, which was Stratton's shoe, had gotten knocked off Stratton's foot from the impact of Howard's car.

[16] The police also later obtained a video taken by an Uber driver ("the Uber driver video") as he was stopped at the corner of Walnut Street and 17th Street. The Uber driver video shows sparks flying from the bottom of the rear passenger side of Howard's car as she drove on Walnut Street and then turned right, while using her turn signal, onto 17th Street.

[17] Additionally, the police obtained a surveillance video from a business located around Walnut and 15th Streets. The police took screenshots of the video, and

those photographs show Howard's car driving on Walnut Street while sparks emanated from the back of her car.

[18] BPD Detective Kevin Frank ("Detective Frank") and an Indiana State Police trooper went to the collision site to do an accident reconstruction investigation. They determined the point of impact and how Stratton had been "throw[n]" from that impact point. (Tr. Vol. 2 at 122). Detective Frank also found Stratton's shoe "several feet north of where the impact area was located." (Tr. Vol. 2 at 122). Additionally, Detective Frank determined Howard's path of travel after she continued to drive away from the collision site. When Detective Frank viewed Howard's car, the detective saw that the passenger side windshield had been broken "as if a large object had been tossed onto it." (Tr. Vol. 2 at 122). Detective Frank also saw that strands of Stratton's hair were "within the windshield" near the "right front A Pillar" of Howard's car. (Tr. Vol. 2 at 123).

[19] The State ultimately charged Howard with: (1) Level 3 felony leaving the scene of an accident after committing the offense causing death when operating a vehicle while intoxicated; (2) Level 4 felony causing death when operating a vehicle while intoxicated; (3) Level 4 felony causing death when operating a vehicle with an ACE of 0.08 or more; and (4) Level 5 felony reckless homicide. Howard was released on bond.

[20] The trial court set Howard's initial hearing for September 23, 2022. The day before the initial hearing, Howard filed a motion for a continuance. Howard

stated that she had a scheduled counseling session for September 23, 2022, and she requested that the trial court reset the initial hearing for September 30, 2022. The State objected to Howard's continuance motion. The trial court granted Howard's motion and reset the initial hearing for September 30, 2022.

[21] During the September 2022 initial hearing, the trial court initially set Howard's jury trial for March 27, 2023. In January 2023, the State received Howard's toxicology report and filed a motion to amend the charging information, which the trial court granted. Thereafter, on February 14, 2023, the March 2023 trial date was cancelled.

[22] In August 2023, Howard's counsel had Howard undergo a psychological evaluation, which was performed by neuropsychologist, Dr. Polly Westcott ("Dr. Westcott"). Howard's counsel requested that Dr. Westcott address the following two questions: (1) whether or not Howard appreciated and understood that her vehicle had hit a pedestrian; and (2) if Howard did not understand or appreciate that her vehicle hit a pedestrian, what was the reasonable cause behind her inability to appreciate and recall circumstances and events that suggested there had been an impact to her car (including damage to her passenger side windshield). In preparation for the evaluation, Dr. Westcott reviewed multiple sources of information, including the police bodycam videos, photographs, narratives from Detective Rodgers and other officers, the probable cause affidavit, the complaint, the toxicology report, and other documents. After Dr. Westcott had tested and evaluated Howard, Dr. Westcott issued a written report in which the doctor diagnosed Howard as having generalized

anxiety disorder and posttraumatic stress disorder ("PTSD"). Dr. Westcott reported that Howard had "clouded memories when at Kilroy's and forg[o]t[] events for a period of time from the time she left Kilroy's to sitting outside her vehicle following the collision." (App. Vol. 3 at 11). Dr. Westcott opined that Howard "never had perception of a pedestrian or awareness that the vehicle hit an object or person." (App. Vol. 3 at 13). Dr. Westcott also opined that Howard's "inability to recall the details of events surrounding the 2022 collision [w]as related to alcohol use (i.e. []AC[E] of 0.226. . .)" and that "[Howard's] perceived 'fleeing' the scene reflects both reduced senses and awareness at the time as well as a sudden and acute awareness of a sudden noise that caused her to instinctively and automatically react by evacuating the situation." (App. Vol. 3 at 13). Dr. Westcott's written evaluation also indicated that Howard had reported that she had previously, on one or two other occasions, drunk alcohol to the point where she had blacked out.

[23] During an August 2023 pretrial conference, the trial court scheduled Howard's jury trial for February 26, 2024. On February 16, 2024, less than two weeks before her scheduled jury trial, Howard filed a motion for the trial court to set a change of plea hearing.

[24] Thereafter, on February 27, 2024, Howard filed with the trial court her plea agreement in which she agreed to plead guilty to Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death and Level 4 felony causing death when operating a vehicle while intoxicated in exchange for the State's dismissal of the

remaining two charges. The plea agreement left sentencing open to the trial court's discretion.

[25] In March 2024, the trial court held Howard's guilty plea hearing. During the hearing, Howard established the factual basis for the two offenses to which she was pleading guilty. She admitted that she drank alcohol at Kilroy's, drove her car, hit and killed Stratton, and failed to stop at the scene. After Howard pleaded guilty to Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death and Level 4 felony causing death when operating a vehicle while intoxicated, the trial court accepted her pleas and entered judgments of conviction.

[26] In preparation for sentencing, the probation department prepared a PSI. The PSI contained an "[o]fficial [v]ersion" of the events surrounding Howard's offense. (App. Vol. 2 at 75). This official version was "summarized from the initial narrative" by Detective Rodgers. (App. Vol. 2 at 75). According to this summary, Howard, on the night of her offense, had told Detective Rodgers that she had had two to three shots of tequila before going to Kilroy's, a shot of vodka as soon as she arrived at Kilroy's, and then access to the bottles of champagne and tequila that were on the table for the private birthday party at Kilroy's. Additionally, the summary revealed that, on the night of the offense, Detective Rodgers had contacted the hospital while Stratton was still alive and learned that Stratton had sustained "multiple injuries, internal bleeding, and at least two locations of bleeding from the brain/head." (App. Vol. 2 at 78).

[27] The PSI also contained Howard's version of the events surrounding her offense. Howard submitted a written statement that was attached to the PSI. In Howard's statement, she recounted the events on the day of her offense. Howard acknowledged that she drank one or two shots of vodka at the tailgate party earlier in the day and then drank an alcoholic drink at her friend's apartment before going to Kilroy's for the birthday party. Additionally, Howard stated that she drank "shots of alcohol" when arriving at Kilroy's and that there was "bottle service" at the party with bottles of champagne and "hard liquor[.]" (App. Vol. 2 at 86). Additionally, Howard stated that, when at Kilroy's, she "recall[ed] being told to open [her] mouth while liquor was being poured down [her] throat[.]" (App. Vol. 2 at 86). In her statement, Howard asserted that she did not recall leaving Kilroy's, striking anyone with her car, or speaking with the police. Howard also stated that "[t]he fact that [she] [could not] recall the details of that night d[id] not diminish [her] responsibility or accountability for the tragic outcome." (App. Vol. 2 at 86).

[28] When being interviewed for the PSI, Howard indicated that she first drank alcohol at age nineteen or twenty and that she "would drink approximately twice a week and would consume two to three drinks at a time." (App. Vol. 2 at 82). Howard also stated that she was undergoing counseling to address her substance use.

[29] Additionally, the PSI included numerous written victim impact statements from Stratton's family and friends. Specifically, twenty-seven people offered letters to convey their sense of grief and loss upon Stratton's death. Many of these

letters included photos of Stratton and a request for the trial court to impose the maximum sixteen-year sentence against Howard. One letter indicated that Stratton's cousin had looked at Howard's social media pages immediately upon learning that Howard had hit and killed Stratton and that the cousin had seen that Howard had had previous posts with photographs and videos of herself drinking at parties. While the cousin was looking at Howard's social media, those photographs and videos were disappearing because Howard was in the process of removing them.

[30] Before sentencing, Howard filed a presentencing memorandum and included over forty letters from Howard's family and friends in support of Howard's character. These letters indicated, in part, that Howard was a caring person who had been raised in a tight-knit and faith-filled family, attended Catholic schools, and had been a good student and volunteer. Howard also attached the August 2023 psychological evaluation report prepared by Dr. Westcott. In her presentencing memorandum, Howard stated that the "pain and embarrassment of her actions ha[d] left a mark on [her] life that will not soon fade." (App. Vol. 2 at 247). Howard also stated that she was no longer "a carefree and happy person" and that "her remorse ha[d] changed her." (App. Vol. 2 at 247). Additionally, Howard asserted that she was "a unique criminal defendant" who had no criminal history or traffic violations and that she was "an inexperienced drinker" who "did not recognize her limitations." (App. Vol. 2 at 247-48). Howard requested the trial court to "impose a mitigated sentence" and stated that "not everyone who commits this offense needs to go to prison." (App. Vol.

2 at 298). Howard further stated that she had been approved as eligible for home detention and asked the trial court to "sentence her to supervision by community corrections and/or a period of probation." (App. Vol. 2 at 298).

[31] During Howard's May 2024 sentencing hearing, Howard and the State presented witnesses and introduced exhibits. Howard presented five witnesses to testify about her character. These character witnesses included Howard's priest, high school teachers, best friend, and sister-in-law. The character witnesses testified that Howard was caring, compassionate, helpful, and hardworking. They also testified that Howard had remorse and a supportive family. Howard also presented testimony from Dr. Westcott, who testified about the August 2023 psychological evaluation of Howard. Dr. Westcott also testified that she had, in August 2023, diagnosed Howard with PTSD and generalized anxiety disorder. Additionally, Dr. Westcott opined that Howard "did not appreciate and understand that her vehicle [had] hit a pedestrian." (Tr. Vol. 2 at 36). Dr. Westcott testified that Howard's high level of alcohol consumption in a short period of time and her .226 ACE were factors in her lack of awareness. Dr. Westcott also opined that Howard's inability to remember the moment of impact was related to Howard's alcohol use combined with a trauma-type moment of "a loud noise" that "scare[d] her . . . out of the situation" and caused her to flee. (Tr. Vol. 2 at 38).

[32] The State introduced thirty-two exhibits, which included the Domino's video, the Uber driver video, and photographs of Howard's vehicle driving down the street while dragging Stratton's scooter and while sparks emanated from the

bottom of Howard's car.  The exhibits also included photographs from the crime scene, photographs of Howard's damaged car and windshield, a simulation video depicting Howard's path of travel after the collision, and a point-of-impact diagram from the accident reconstructionist.

[33]   The State also presented victim-impact testimony from five people, including Stratton's parents, two sisters, and one of his friends.  These witnesses, who all described Stratton's loving, kind, caring, energetic, positive, and charismatic nature, asked the trial court to impose the maximum sentence on Howard. They told the trial court how Howard's actions of choosing to drive drunk and leaving Stratton in the street had caused and continued to cause them to feel extreme pain, sadness, anger, and anguish in their daily lives.  Stratton's sister testified that their family had PTSD and "suffer[ed] a range of emotions every single day[.]"  (Tr. Vol. 2 at 138).  Stratton's father testified that Stratton's mother had cried herself to sleep every night since Stratton's death.  Stratton's father also testified that he could not "go for a week without multiple times having to replay the vision of [his] son's head smashing into a windshield of [Howard's] car and being projected over fifty feet as [Howard's] car [wa]s racing away with [his] son's scooter dragging under the car emitting sparks, leaving [his] son for dead on the sidewalk bleeding profusely . . . from the head."  (Tr. Vol. 2 at 151).  Stratton's father also told the trial court that Stratton had not died at the scene and that, instead, Stratton "and his body [had] suffered for many hours while he endured five heart attacks and multiple internal injuries before slowly, slowly succumbing to his death."  (Tr. Vol. 2 at

154). Stratton's family also expressed their outrage that Howard had never apologized to their family.

[34] During Stratton's friend's testimony, she stated that she had scrolled through Howard's Instagram after Stratton's death and had seen that Howard's Instagram was "[f]illed with pictures of [Howard] at bars, parties, along with other Indiana University sorority life and fraternity parties and bar tending depictions." (Tr. Vol. 2 at 87). Stratton's friend also testified that Howard had since deleted the photographs in an apparent "attempt to cover up the reality of her life." (Tr. Vol. 2 at 87).

[35] Additionally, the State also presented testimony from three witnesses who provided details about Howard's offense. These witnesses included a man who had witnessed the events surrounding the collision as well as two police officers who had been involved in the police investigation.

[36] The witness to the offense, Dustin Bowman ("Bowman"), testified that he lived at the corner where Howard had struck Stratton and that he and his girlfriend had been sitting on his porch when the collision had occurred. Bowman testified that he had heard "a very loud crashing sound . . . as if someone threw a chair through a window." (Tr. Vol. 2 at 116). Bowman ran one hundred feet to where Stratton was lying and saw Howard's car "driving, swerving into the middle of Walnut [Street], dragging something underneath of it, but continuing on[.]" (Tr. Vol. 2 at 116). Bowman further testified that as Howard's car drove away, it "went very quickly" and "very fast." (Tr. Vol. 2 at 117). Bowman

testified that "[t]here were no break [sic] lights" on the car, and he estimated that the car drove "at least sixty to seventy miles an hour[.]" (Tr. Vol. 2 at 117-18). Bowman acknowledged that he did not have any specific training for estimating speed and stated that his basis for estimating Howard's speed at sixty to seventy miles per hour was "by driving a vehicle at said speeds[.]" (Tr. Vol. 2 at 119). Bowman also testified that he generally saw people driving "roughly the speed limit when they go by [his] house which [wa]s all day long and [that] you can tell if people are going very fast as opposed to moderate." (Tr. Vol. 2 at 119).

[37] Detective Rodgers and Detective Frank also testified during the sentencing hearing. Detective Rodgers testified about the facts surrounding Howard's offense, as set forth in the facts above, and the investigation that followed. During Detective Rodgers' testimony, the State played the Domino's video, which showed multiple cars driving by the store before Howard's car had driven by the store while on the sidewalk after she had hit Stratton. Detective Rodgers pointed out that "while a speed [of Howard's car] c[ould][]not be determined, visually it appear[ed] to be going faster than the other vehicles that were going north bound before it." (Tr. Vol. 2 at 95).

[38] Detective Frank testified about the accident reconstruction investigation. Detective Frank testified that Howard had been driving her car north on Walnut Street when she drove on the east sidewalk, drove across the bike lane, and struck Stratton with her car just south of 12th Street. Detective Frank testified that Howard then continued northbound on the sidewalk for an

"extended period of time" and eventually went back on the road after she had driven north of 12th Street. (Tr. Vol. 2 at 121). Additionally, Detective Frank testified that there was "extensive damage" to the front passenger side of Howard's car, including the windshield, A Pillar, bumper, fender, and side of the car. Detective Frank testified that he had not been able to determine Howard's specific speed, but he noted that there had been "no type of break [sic] marks located anywhere at the scene[.]" (Tr. Vol. 2 at 135). Detective Frank explained that brake marks or skid marks were a "primary determinate" for determining a person's speed because the measurement of the marks was needed in such a determination. (Tr. Vol. 2 at 134).

[39] When Howard gave her statement of allocution, she expressed her remorse and apologized to Stratton's family. Howard stated that she was "filled with great remorse" that she felt "at all times" and "never [went] away." (Tr. Vol. 2 at 161, 162). She also stated that her "lack of judgment in deciding to drive intoxicated and the result in consequences haunt[ed] [her] every waking moment." (Tr. Vol. 2 at 162). Additionally, Howard stated that she wanted to "to sincerely apologize to the Stratton family" and that "[her] actions deserve[d] no form of excuse[.]" (Tr. Vol. 2 at 161). Howard also stated that she and her parents had wanted to speak to and apologize to the Stratton's family but that her attorney had told her that she was not allowed to do so while her case was pending.

[40] When arguing about Howard's potential sentence, Howard's counsel argued that the trial court should impose "a mitigated sentence less than the advisory"

and requested that any executed sentence be served under the supervision of community corrections. (Tr. Vol. at 173). Howard's counsel argued that Howard had "spent her life doing good deeds" and that the letters submitted on Howard's character showed that she had "integrity and trust worthiness." (Tr. Vol. 2 at 168). Howard's counsel also asserted that Howard was "more than her worst bad act committed on a single night of severely impaired judgment." (Tr. Vol. 2 at 168). Howard requested that the trial court consider the following mitigating circumstances: (1) lack of criminal history; (2) acceptance of responsibility by pleading guilty; (3) PTSD diagnosis; (4) unlikelihood to commit another crime; (5) likelihood to respond affirmatively to probation or a short period of incarceration; (6) the crime being a result of circumstances unlikely to recur; (7) remorse; (8) good character; and (9) voluntary intoxication, not as a defense, but to support substantial grounds tending to excuse or justify the crime.[3] Additionally, Howard argued that the trial court should not consider the harm or injury suffered by the victim to be an aggravating circumstance. Howard acknowledged that the harm or injury was significant but argued that it was not greater than the elements necessary to prove the commission of the crime. Howard's counsel argued that causing death was an element of the offense and that Howard had "not cause[d] an outcome worse than death." (Tr. Vol. 2 at 170). Furthermore, Howard's counsel stated that she had instructed Howard to remove her social media posts

---

[3] In Howard's presentencing memorandum, she set forth these same mitigating circumstances in addition to a proffered mitigator that she was willing to make restitution.

and not to reach out to Stratton's family, and counsel asserted that those actions should not be held against Howard.

[41] The State argued that the trial court should impose a sentence greater than the nine-year advisory sentence. The State argued that the trial court should consider the nature and circumstances of the offense—including Howard's excessive intoxication, her speed, and the fact that she drove in such a manner in a highly populated area—to be an aggravating factor. Additionally, the State argued that the trial court should reject Howard's request to serve her sentence on house arrest because house arrest was "not real accountability[.]" (Tr. Vol. 2 at 166).

[42] Before imposing Howard's sentence, the trial court stated that the "parties agree[d]" that, "pursuant to case law," Howard's two convictions "c[ould] not stand." (Tr. Vol. 2 at 173). The trial court then vacated Howard's conviction for Level 4 felony causing death when operating a vehicle while intoxicated and merged it into the remaining conviction. The trial court then proceeded to sentencing Howard on her Level 3 felony leaving the scene of an accident after committing the offense causing death when operating a vehicle while intoxicated conviction and stated as follows:

> I am well aware that the decision that I make today will have an impact on so many people's lives and that weight is not lost on me in any way[,] shape[,] or form. . . . [S]ince the change of plea, I've thought long and hard about the best way, what the best sentence should be. The one thing I have for sure come to realize is that there is nothing I could say to anyone in this room that will make this situation any less devastating. Plain and

simply. There are moments when words can just do nothing to help, and this is such a moment. I have read all the letters . . . sent on behalf of [Stratton,] and I have no doubt that this world will miss out on everything [he] could have contributed to. I see his infectious smile, I've read letter upon letter about the impact he has had on the people around him and that has simply just been lost. I've also read the letters submitted on behalf of . . . Ms. Howard. I hope that those letters had given me into insight, Ms. Howard, into how you will respond, and I hope that you will live your life in a way that makes Nathanial Stratton's life matter because if you don't, if you fail to do that, that again will be another tragedy of your own making. . . . Tur[n]ing [to] the aggravators and mitigators[,] I agree with the State of Indiana that the extreme level of intoxication, point two two [(.22 ACE)], is an aggravator. The rate in which the automobile was traveling is an aggravator and the driving in which . . . Ms. Howard drove the car[] is an aggravator. Ve[e]ring onto the sidewalk and nearly striking other people, . . . plain and simply cannot be ignored. Turing to the mitigators, [Howard's counsel], you've argued that there are substantial grounds tending to excuse or justify the crime but failing to establish a defense. An alcohol level of point two two, I think gives an explanation as to Ms. Howard's lack of memory, but in no way does that serve as a mitigator, and I just plain and simply refuse to allow a point two two to become a mitigator. . . . Ms. Howard does, however, have no significant history of delinquency o[r] criminal activity. . . . [A]s a result, I do find that the aggravators outweigh the mitigators and I f[ind] that [it] is . . . appropriate to issue an aggravated sentence.

(Tr. Vol. 2 at 173-75).

[43] For Howard's Level 3 felony conviction, the trial court imposed a twelve (12) year sentence, with ten (10) years executed in the Indiana Department of Correction ("DOC") and two (2) years suspended to probation. The trial court also suspended Howard's driver's license for sixteen (16) years.

[44] Howard now appeals.

## Decision

[45] Howard argues that: (1) the trial court abused its discretion when sentencing her; and (2) her sentence is inappropriate. We will review each argument in turn.

### 1. Abuse of Discretion in Sentencing

[46] We first address Howard's argument that the trial court abused its discretion when sentencing her. Specifically, Howard contends that the trial court abused its discretion when determining mitigating and aggravating circumstances.

[47] Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion in several ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91.

## A. Mitigating Circumstances

[48] We first address Howard's arguments regarding mitigating circumstances. Howard contends that the trial court abused its discretion by failing to find the following mitigating circumstances: (1) PTSD diagnosis; (2) remorse; (3) young age; (4) guilty plea and acceptance of responsibility; and (5) character.

[49] The determination of mitigating circumstances lies within the trial court's discretion. *Spears v. State*, 735 N.E.2d 1161, 1167 (Ind. 2000), *reh'g denied*. A trial court is not obligated to accept a defendant's claim as to what constitutes a mitigating circumstance. *Rascoe v. State*, 736 N.E.2d 246, 249 (Ind. 2000). In fact, a claim that the trial court failed to find a mitigating circumstance requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493.

[50] We first note that Howard repeatedly argues that the trial court failed to properly weigh her proffered mitigating circumstances. This argument is without merit for all proffered mitigating circumstances because our Indiana Supreme Court has explained that the degree of weight the trial court assigns to a particular mitigating factor is not an appropriate basis for appeal. *See Anglemyer*, 868 N.E.2d at 491 ("Because the trial court no longer has any obligation to 'weigh' aggravating and mitigating factors against each other when imposing a sentence, . . . a trial court can not now be said to have abused its discretion in failing to 'properly weigh' such factors.").

We also note that Howard did not raise mitigator (3) of Howard's young age as a separate mitigating factor to the trial court. "If the defendant does not advance a factor to be mitigating at sentencing, this Court will presume that the factor is not significant[,] and the defendant is precluded from advancing it as a mitigating circumstance for the first time on appeal." *Spears*, 735 N.E.2d at 1167. *See also Simms v. State*, 791 N.E.2d 225, 233 (Ind. Ct. App. 2003) (holding that the defendant was precluded from raising a mitigating circumstance on appeal when he had failed to advance it as a mitigating circumstance at sentencing). Therefore, we need not review Howard's argument relating to the mitigating circumstance that she did not raise to the trial court.[4]

Additionally, we need not review Howard's general assertion that the trial court abused its discretion by failing to find her character as a mitigating circumstance. Howard makes no separate argument regarding this assertion and provides no cogent argument in regard to this proposed mitigator. Accordingly, Howard has waived appellate review of this argument. *See* Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, and contrary to Howard's suggestion, the trial court did not overlook her character as a proffered mitigating circumstance. Instead, as explained in the facts above, the trial court recognized the proffered mitigator when it acknowledged Howard's

---

[4] Moreover, even if Howard, who was a twenty-two-year-old college graduate, had proffered the mitigator below, there would be no abuse of discretion for the trial court to decline to find her age to be a mitigator. *See Sensback v. State*, 720 N.E.2d 1160, 1164 (Ind. 1999) (explaining that once a defendant is eighteen years old, the defendant "is beyond the age at which the law commands special treatment by virtue of youth").

submitted character evidence and then simply declined to find it as a mitigating factor.

[53] Turning to Howard's argument regarding her PTSD diagnosis, we note that Howard makes a general assertion that INDIANA CODE § 35-38-1-7.1(b)(13) "dictates" that a PTSD diagnosis is "a mitigating factor under Indiana law." (Howard's Br. 13). However, the statute merely provides that a trial court "may consider" PTSD as a mitigating circumstance, not that it must do so. *See* I.C. § 35-38-1-7.1(b)(13) (providing that a trial court "may consider" a person's "posttraumatic stress disorder, traumatic brain injury, or a postconcussive brain injury" as a mitigating circumstance). Furthermore, Howard, however, does not argue that she had a prior PTSD diagnosis that had some sort of nexus with the commission of her offense. Instead, Howard contends that her acts of choosing to drink alcohol to excess, driving her car into Stratton as he rode his scooter, fleeing the scene, and causing Stratton's death led to her PTSD diagnosis that the trial court should have applied as a mitigating circumstance. In order for a defendant's mental history, such as PTSD, to provide a basis for establishing a mitigating factor, "there must be a nexus between the defendant's mental health and the crime in question." *Corralez v. State*, 815 N.E.2d 1023, 1026 (Ind. Ct. App. 2004). *See also Fisher v. State*, -- N.E.3d -- , 2025 WL 1739799 at *7, (Ind. Ct. App. June 24, 2025). Because Howard did not establish such a nexus, we conclude that the trial court did not abuse its discretion by declining to find Howard's post-offense PTSD diagnosis to be a mitigating factor. *See, e.g.*, *id.* (holding that the trial court did not abuse its

sentencing discretion where the defendant had failed to establish a nexus between his PTSD and his crime).

[54] Next, Howard argues that the trial court abused its discretion by failing to find her remorse to be a mitigating circumstance. Our Court gives "substantial deference" to a trial court's evaluation of remorse. *Corralez*, 815 N.E.2d at 1025. A trial court's determination of a defendant's remorse is similar to a determination of credibility and, without evidence of some impermissible consideration by the trial court, our appellate courts will accept the trial court's determination. *Pickens v. State*, 767 N.E.2d 530, 535 (Ind. 2002). Here, Howard does not allege any sort of impermissible consideration. Instead, she asserts that she expressed her remorse during sentencing and that several character witnesses also testified that she was remorseful. However, "a defendant's reference to statements articulating [her] remorse is insufficient to establish an abuse of discretion." *Snyder v. State*, 176 N.E.3d 995, 998 (Ind. Ct. App. 2021). Accordingly, we conclude Howard has not shown that the trial court abused its discretion in this instance. *See, e.g.*, *Pickens*, 767 N.E.2d at 535; *Hape v. State*, 903 N.E.2d 977, 1003 (Ind. Ct. App. 2009) (explaining that without evidence of some impermissible consideration by the trial court, we accept its determination regarding whether to find remorse as a mitigating factor), *trans. denied*.

[55] Howard also argues that the trial court abused its discretion by failing to find her guilty plea and acceptance of responsibility as a mitigating circumstance. Specifically, Howard contends that she did not receive any benefit by pleading guilty because, according to Howard, the two charges that were dismissed

(reckless homicide and causing death when operating a vehicle with an ACE of 0.08 or more) would have been merged into her current conviction at sentencing. Howard, however, provides no support to show that either of her dismissed charges violated double jeopardy, and she does not provide an analysis under *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020). Howard also contends that the trial court should have found her guilty plea to be a substantial mitigating factor because she saved judicial resources and "spared" Stratton's family from a "full-blown trial." (Howard's Br. 15).

[56] "Indiana courts have recognized that a guilty plea is a significant mitigating circumstance in some circumstances." *Trueblood v. State,* 715 N.E.2d 1242, 1257 (Ind. 1999), *reh'g denied*, *cert. denied*. "Nevertheless, this determination is necessarily fact sensitive, and not every plea of guilty is a significant mitigating circumstance that must be credited by a trial court." *Id.* "The extent to which a guilty plea is mitigating, however, will vary from case to case." *Lavoie v. State*, 903 N.E.2d 135, 143 (Ind. Ct. App. 2009). Indeed, "[a] guilty plea is not automatically a significant mitigating factor." *Sensback v. State*, 720 N.E.2d 1160, 1165 (Ind. 1999). Specifically, "a guilty plea does not rise to the level of significant mitigation where the defendant has received a substantial benefit from the plea or where the evidence against [the defendant] is such that the decision to plead guilty is merely a pragmatic one." *Wells v. State,* 836 N.E.2d 475, 479 (Ind. Ct. App. 2005), *trans. denied*. *See also Amalfitano v. State*, 956 N.E.2d 208, 212 (Ind. Ct. App. 2011) (explaining that "[a] guilty plea is not necessarily a mitigating factor where the . . . evidence against the defendant is

so strong that the decision to plead guilty is merely pragmatic"), *trans. denied*. Furthermore, "[a] plea's significance is reduced if it is made on the eve of trial." *Barker v. State*, 994 N.E.2d 306, 312 (Ind. Ct. App. 2013) (cleaned up), *reh'g denied*, *trans. denied*.

[57] Here, two weeks before Howard's scheduled jury trial, she informed the trial court that she intended to plead guilty. Howard then submitted her guilty plea agreement the day after the scheduled trial date. Thereafter, Howard pled guilty to Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death and Level 4 felony causing death when operating a vehicle while intoxicated in exchange for the dismissal of the remaining two charges of Level 5 felony reckless homicide and Level 4 felony causing death when operating a vehicle with an ACE of 0.08 or more. During Howard's sentencing hearing, the State presented testimony from three witnesses who provided details about Howard's offense, including a man who had witnessed the events surrounding the collision as well as two police officers who had been involved in the police investigation. One of the detectives specifically testified about Howard's statements and McCollough's statements made after the collision. The State also introduced thirty-two exhibits, including a video from the collision scene that showed Stratton's shoe flying in the air and bouncing on the street, photographs of Howard's car driving away from the scene with Stratton's scooter under her car while sparks emanated from the back of her car, photographs of Howard's shattered windshield with Stratton's hair sticking out

of it, photographs of Howard's damaged car, photographs of Stratton's damaged scooter, and the toxicology report showing that Howard had an ACE of .226. When sentencing Howard, the trial court acknowledged Howard's guilty plea and stated that, between Howard's guilty plea hearing and her sentencing hearing, the court had thought long and hard about what Howard's sentence should be.

[58] In light of all these circumstances—including Howard's plea shortly before her scheduled jury trial, the benefit from the dismissal of charges, and the record on appeal showing that the evidence against Howard was so strong that her decision to plead guilty was largely a pragmatic decision—we conclude that the trial court did not abuse its discretion when it did not identify Howard's guilty plea as a mitigating circumstance. *See, e.g.*, *Amalfitano*, 956 N.E.2d at 212 (holding that the trial court did not abuse its discretion by failing to find the defendant's guilty plea as a mitigating factor); *Wells,* 836 N.E.2d at 479-80 (concluding that the trial court did not abuse its discretion where the defendant had charges dismissed and the evidence against the defendant was such that his decision to plead guilty was a pragmatic decision).

## B. Aggravating Circumstances

[59] We now turn to Howard's appellate challenge to the aggravating circumstances. Howard argues that the trial court abused its discretion by finding her level of intoxication and manner of driving as aggravating circumstances.

[60] We first address Howard's argument regarding level of intoxication. Howard argues that the trial court abused its discretion by relying upon her level of intoxication as an aggravating circumstance because it was an element of her crime. Generally, a fact that comprises a material element of an offense may not also be relied upon as an aggravator to enhance the sentence for that offense. *Morgan v. State*, 675 N.E.2d 1067, 1073 (Ind. 1996); *Rodriguez v. State*, 785 N.E.2d 1169, 1178 (Ind. Ct. App. 2003), *superseded by statute on other grounds*, *trans. denied.* However, the particularized circumstances of a criminal act may constitute a separate aggravating circumstance. *Morgan*, 675 N.E.2d at 1073; *Rodriguez*, 785 N.E.2d at 1178.

[61] Here, Howard pleaded guilty to Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death. The element of operating a vehicle while intoxicated causing death is under INDIANA CODE § 9-30-5-5, which requires a showing of either intoxication or a .08 ACE. The trial court specifically referred to the particularized circumstance that Howard had an "extreme level of intoxication" with her .226 ACE. (Tr. Vol. 2 at 174). Accordingly, the trial court did not abuse its discretion by finding Howard's level of intoxication of a .226 ACE, which was nearly three times the legal limit, to be an aggravating circumstance. *See, e.g.*, *Rodriguez*, 785 N.E.2d at 1178 (holding that, in a case involving a defendant who pleaded guilty to operating a motor vehicle while intoxicated causing death, the trial court properly considered as an aggravating

circumstance the particularized fact that the defendant's BAC was nearly three times the legal limit at the time of a traffic accident).

[62] We next address Howard's argument that the trial court improperly found her manner of driving, specifically her speed and act of driving on the sidewalk, to be aggravating circumstances. She also argues that the record was "completely devoid" of evidence to support a finding that she had been speeding. (Howard's Br. 17).

[63] During Howard's sentencing hearing, the State argued that the trial court should consider the nature and circumstances of the offense—including Howard's speed and the fact that she drove in such a manner in a highly populated area—to be an aggravating factor. The trial court specifically "agree[d]" with the State and found that "[t]he rate in which [Howard's] automobile was traveling" and her act of "[v]e[e]ring onto the sidewalk and nearly striking other people" were aggravating. (Tr. Vol. 2 at 174, 175). The trial court did not abuse its discretion by considering these specific aspects of Howard's manner of driving as part of the nature and circumstances of the crime, which is a proper aggravating circumstance. *See McCann v. State*, 749 N.E.2d 1116, 1120 (Ind. 2001) (explaining that the nature and circumstances of a crime is a proper aggravating factor).

[64] Additionally, we find no merit in Howard's argument that the trial court's finding that she had been speeding was unsupported by the record. As set forth in the facts above, during the sentencing hearing, Bowman, who lived at the

corner where Howard had struck Stratton had been sitting on his porch when the collision had occurred, testified about seeing Howard's car as she drove away from the scene. Bowman testified that, after he had heard "a very loud crashing sound . . . as if someone threw a chair through a window[,]" he saw Howard's car driving away "very quickly" and "very fast." (Tr. Vol. 2 at 116, 117). Bowman also testified that Howard's car had no brake lights applied, and he estimated that Howard drove "at least sixty to seventy miles an hour[.]" (Tr. Vol. 2 at 117). Bowman acknowledged that he did not have any specific training for estimating speed, but he explained his basis for estimating Howard's speed. While Detective Frank testified that he had not been able to determine Howard's specific speed, he stated that he had been unable to do so because there were no brake marks located at the scene. Additionally, a review of the Domino's video reveals that Howard's car appeared to be driving more quickly than the other passing cars. In regard to that video, Detective Rodgers pointed out that "while a speed [of Howard's car] c[ould][]not be determined, visually it appear[ed] to be going faster than the other vehicles that were going north bound before it." (Tr. Vol. 2 at 95). Thus, we conclude that the trial court did not abuse its discretion by referencing Howard's speed as part of the aggravating factor of the nature and circumstances of the crime.

## 2. Inappropriate Sentence

[65] We next turn to Howard's argument that her sentence is inappropriate. Howard generally requests that we "shorten the sentence." (Howard's Br. 21).

[66] We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The defendant has the burden of persuading us that her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of an Appellate Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether we regard a sentence as inappropriate turns on the "culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224. "Appellate Rule 7(B) analysis is not to determine whether another sentence is more appropriate but rather whether the sentence imposed is inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (cleaned up), *reh'g denied*.

[67] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. Howard pleaded guilty and was convicted of Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death. A person who commits a Level 3 felony "shall be imprisoned for a fixed term of between three (3) and sixteen (16) years, with the advisory sentence being nine (9) years." I.C. § 35-50-2-5(b). Here, the trial court imposed a sentence of twelve (12) years, with ten (10) years executed and

two (2) years suspended to probation. Thus, the trial court imposed a sentence that was halfway between the advisory and the maximum sentence, and the executed portion of Howard's sentence was one year above the advisory.

[68] We first turn to the nature of Howard's offense. "The nature of the offense is found in the details and circumstances surrounding the offense and the defendant's participation." *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). Here, twenty-two-year-old Howard consumed multiple shots of alcoholic drinks with her friends, got into her car, and drove to Kilroy's around 11:00 p.m. Upon arriving at the bar, Howard drank more alcohol and then went upstairs to the private birthday party. The birthday party had "bottle service" where full bottles of alcohol were available for the partygoers to share. (Tr. Vol. 2 at 105). Howard then had liquor "poured down [her] throat[.]" (App. Vol. 2 at 86). Around 1:45 a.m., Howard—despite her heavy alcohol consumption—told her friend, McCollough, that she would drive him home. Howard then drove her car northbound on Walnut Street just south of 12th Street. This area was "a very high traffic area[,]" including vehicle and pedestrian traffic. (Tr. Vol. 2 at 93). As Howard quickly drove on Walnut Street, she veered her car into the bike lane. A pedestrian who was on the corner of Walnut and 12th Streets had to jump out of the path of Howard's car in order to avoid being hit by Howard. Howard then struck twenty-year-old Stratton, who was riding his scooter in the bike lane. The impact between Howard's car and Stratton knocked Stratton's shoe off his foot, shattered Howard's passenger-side windshield, and threw Stratton's body further north on Walnut Street. The shattered glass from the

windshield fell inside Howard's car. Howard did not stop her car or apply her brakes. Instead, Howard drove her car on the sidewalk for approximately 220 feet before she returned to the road. As Stratton lay bleeding in the street, Howard drove away dragging Stratton's scooter under her car, which caused sparks to fly from the rear of her car. Howard asked McCollough if she had hit something and asked what she should do. McCollough told Howard to stop the car, but Howard "kept driving for . . . another minute." (Tr. Vol. 2 at 107). Howard eventually stopped her car at the intersection of Lincoln and 19th Streets, where multiple people yelled at her about the scooter stuck underneath her car. Howard had an ACE of .226. Stratton did not die at the scene. Stratton was taken to the hospital, where he suffered five heart attacks before passing away.

[69] When addressing the nature of her offense, Howard sets forth the basic facts that she operated her vehicle while intoxicated; she struck Stratton, which resulted in his death; and she left the scene of the collision. Howard asserts that "while [it was] extremely serious and impactful, the nature of the offense was tragically non-unique[.]" (Howard's Br. 22). Howard further attempts to minimize the nature of the offense by asserting that she "did not leave the scene in an attempt to flee from what she had done." (Howard's Br. 21). Howard's argument regarding the nature of her offense does not persuade us that her sentence is inappropriate. In fact, the circumstances of this case might even justify a lengthier sentence, but we choose to affirm the trial court who was in the best position to consider the evidence and credibility of those who testified.

In that regard, we also have the authority to increase sentences when a defendant requests appellate review. *See Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010) (holding that when a defendant requests appellate review under Appellate Rule 7(B), we have the authority to affirm, reduce, or even increase the sentence).

[70] We next turn to a review of Howard's character. In reviewing Howard's character, we note that "[a] defendant's life and conduct are illustrative of his or her character." *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied*. Howard asserts that her positive character is reflected by her lack of criminal history, guilty plea, remorse, academic achievements, family support, and the character letters and witnesses who wrote or spoke on her behalf. We acknowledge that the record shows that Howard has positive aspects to her character. At the same time, there are factors in the record that diminish that positivity and reflect poorly on her character. First and foremost, Howard's character is reflected by her choice to consume a large amount of alcohol that put her at an ACE of .226 and then drive her car. When being interviewed for the PSI, Howard indicated that she first drank alcohol at age nineteen or twenty and that she would drink approximately twice a week and would consume two to three drinks. Howard told Dr. Westcott that she had drunk alcohol to the point where she had blacked out on other occasions. Additionally, Howard's choice to flee from the scene after striking Stratton with her car shows disregard for Stratton's well-being and reflects poorly on her character. While her act of not stopping at the scene is an element of her offense, her decision to speed

away and to ignore McCollough's suggestion to stop the car after the windshield had been shattered further reveals a disregard for a fellow human being.

[71] Howard has not persuaded us that her sentence for her Level 3 felony leaving the scene of an accident during or after the commission of the offense of operating a vehicle while intoxicated causing death conviction is inappropriate. Therefore, we affirm the sentence imposed by the trial court.[5]

[72] Affirmed.

Weissmann, J., and Felix, J., concur.

ATTORNEYS FOR APPELLANT

Katharine C. Liell
Liell & McNeil Attorneys, PC
Bloomington, Indiana

Eric R. McNeil
Voyle Vaiana Lukemeyer Baldwin & Webb
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

---

[5] We note Howard briefly references Article 1, Section 18 of the Indiana Constitution and suggests that Howard's sentence was "manifestly vindictive" and violates Section 18. (Howard's Br. 21). However, "[i]t is well-settled that Section 18 applies only to the penal code as a whole, not to individual sentences." *Kedrowitz v. State*, 199 N.E.3d 386, 409 (Ind. Ct. App. 2022) (cleaned up), *reh'g denied*, *trans. denied*. Thus, Howard's assertion that her particular sentence violates Section 18 "is not a cognizable claim on which relief can be granted because particularized, individual applications are not reviewable pursuant to this provision." *Id.* (cleaned up).

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana